T.C. Memo. 2013-34

UNITED STATES TAX COURT

ESTATE OF HARVEY EVENCHIK, GREGORY V. GADARIAN, PERSONAL
REPRESENTATIVE, AND DEANNA C. EVENCHIK, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17245-10.                    Filed February 4, 2013.

Gregory Vartan Gadarian, for petitioners.

Derek W. Kaczmarek, for respondent.

MEMORANDUM OPINION

HOLMES, Judge:  Harvey and Deanna Evenchik donated shares in a

corporation to a charity.  The corporation's only assets were two apartment

[*2] buildings.[1] They attached two appraisals--one for each building--to their return but no appraisal of the shares. To claim a deduction for that donation, the Code requires a "qualified appraisal." The question is whether these two appraisals, taken together, were enough.

Background

Harvey Evenchik owned shares in a corporation known as the Chateau Apartments, Inc. Chateau's sole assets were two apartment buildings--a 42-unit building known as the Chateau Apartments at 3666 East 2nd Street in Tucson, Arizona (Second Street), and a 10-unit complex at 3815 through 3821 East Lee Street, also in Tucson (Lee Street).

Sometime in 2004 Harvey donated the approximately 72% of Chateau's capital stock that he owned--15,534.67 shares--to Family Housing Resources, Inc. (FHR), a nonprofit housing corporation. The exact date of the contribution is not clear. On March 5, 2004, Harvey entered into a stock-pledge agreement with FHR memorializing his desire to give FHR the 15,534.67 Chateau shares. That agreement provided that FHR's obligation to close was conditioned on, among other things, Harvey's delivering the share certificates to FHR. (FHR apparently

---

[1] Harvey died after the Evenchiks filed the petition in this case, and we substituted his estate and Gregory V. Gadarian as its personal representative as petitioner.

[*3] included that condition because Harvey had lost them.) To remedy that problem, Harvey executed two documents--each titled "Affidavit of Lost Stock Certificate"--on August 19, 2004. Those affidavits stated that Harvey did not physically possess the Chateau stock certificates and requested that new certificates for those shares be issued to FHR. Thus, Harvey couldn't have transferred the shares to FHR before August 19, 2004. Harvey eventually formally assigned and transferred his rights in the 15,534.67 Chateau shares to FHR by executing two separate documents titled "Assignment of Stock by Gift." Neither of those assignments, however, bore a date. That donation enabled FHR to create an endowment fund to assist low-to-moderate-income individuals and families obtain affordable housing. On December 16, 2004, FHR sent Harvey a letter thanking him for the gift. We therefore find it more likely than not that the date of the Evenchiks' contribution was somewhere between August 19 (the date Harvey executed the Affidavits of Lost Stock Certificate) and December 16, 2004. FHR's letter acknowledged that FHR had received 15,534.67 shares representing 72.3384% of Chateau's capital stock. It also stated that, based upon a $1,445,000 appraised value of Chateau's underlying assets, FHR valued the contribution at $1,045,289.30.

**[*4]**    The Evenchiks reported that donation on Form 8283, Noncash Charitable Contributions, which they attached to their 2004 tax return.  That Form 8283 described the donated property as "15,534.67 shares Chateau Apartments, Inc. common stock" and stated the appraised market value was $1,045,289.30.  In support of that valuation, the Evenchiks attached two appraisals of Chateau's underlying assets prepared by Sanders K. Solot & Associates.  The first report--dated August 13, 2004--appraised Second Street; it identified the property as "an apartment complex, located at 3666 East 2nd Street in Tucson, Arizona," and concluded the estimated value on August 13, 2004, was $1,100,000 using a sales-comparison approach.  The second report--dated August 19, 2004--appraised Lee Street; it identified the property as "a 10-unit apartment complex" "located at 3815 through 3821 East Lee Street, in Tucson, Pima County, Arizona," and concluded the estimated value on August 19, 2004, was $345,000 based on both a sales-comparison approach and an income approach.  Neither appraisal, however, opined on the fair market value of Chateau's outstanding shares, much less Harvey's 72.3384% interest in those shares.

**[\*5]**   Due to restrictions contained in section 170,[2] however, the Evenchiks weren't able to claim the entire $1,045,289.30 as a deduction for 2004.  That caused them to claim part of that charitable deduction as a carryforward on their 2006 tax return.  The Commissioner audited the 2006 return and didn't agree with a number of deductions that the Evenchiks had claimed.  He issued a notice of deficiency to them on May 6, 2010, disallowing, among other things, the entire charitable deduction carryforward for 2006 because the Evenchiks had failed to "establish (a) the name and address of the qualifying organization, (b) provide a list of the donations, and (c) show the fair market value of each item on the date of contribution."  After various concessions by the parties,[3] the sole question left for us to answer is whether the Evenchiks submitted a qualified appraisal for the charitable deduction carryforward claimed on their 2006 return.

The Evenchiks were Arizona residents when they filed their petition.  The parties submitted the case for decision under Rule 122.

---

[2] All section references are to the Internal Revenue Code in effect at all relevant times, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[3] The parties stipulated that the proper value of the 72.3384% interest in Chateau was about $680,000, not the approximately $1.045 million that the Evenchiks claimed on their 2004 tax return.  What is still at issue, however, is whether the Evenchiks are entitled to claim even that amount as a charitable deduction.

**[*6]**                              Discussion

I.     Section 170 and the Accompanying Regulations

Section 170 governs the deductibility of charitable donations, and states that

"[a] charitable contribution shall be allowable as a deduction only if verified under

regulations prescribed by the Secretary." Sec. 170(a)(1).  The Deficit Reduction

Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 155, 98 Stat. at 691--which

provided rules for substantiating charitable contributions--ordered the Secretary to

prescribe regulations under section 170(a)(1) that would require a taxpayer

claiming a deduction for the donation of property worth more than $5,000 to

"obtain a qualified appraisal for the property contributed."  DEFRA section 155

defined "qualified appraisal" to include any "additional information as the

Secretary prescribes in such regulations."  98 Stat. at 692.  Congress codified that

concept in 2004 by adding paragraph (11) to section 170(f) to require a taxpayer to

obtain a qualified appraisal for contributions of property if he has claimed a

deduction of more than $5,000 for that property.  Sec. 170(f)(11)(C) (as amended

by American Jobs Creation Act of 2004, Pub L. No. 108-357, sec. 883(a), 118

Stat. at 1631).[4]  Paragraph (11)(E) defines the term "qualified appraisal" of a

---

[4] Section 170(f)(11) applies only to contributions made after June 3, 2004. 118 Stat. at 1632.  The Evenchiks suggest that section 170(f)(11) doesn't apply to

(continued...)

**[*7]** property as "a qualified appraisal under regulations or other guidance prescribed by the Secretary." Sec. 170(f)(11)(E).

These express delegations of authority to the Secretary to issue regulations prompted him to forge the hoops that a taxpayer must crawl through to claim a deduction. And the hoops become longer and tighter as the value of donated property rises. There are especially extensive substantiation requirements for noncash charitable deductions greater than $5,000. See sec. 1.170A-13(c), Income Tax Regs. Those regulations say that "[n]o deduction under section 170 shall be allowed with respect to a charitable contribution * * * unless the substantiation requirements described in paragraph (c)(2) of this section are met." Sec. 1.170A-13(c)(1)(i), Income Tax Regs. While paragraph (c)(2) provides three specific substantiation requirements, the only one at issue here is the requirement that the donor "[o]btain a qualified appraisal * * * for [the] property contributed. If the

---

[4](...continued)
their contribution in 2004 because Harvey made the donation "pursuant to a pledge dated March 5, 2004." We agree with the Commissioner that the Evenchiks donated the stock only later in the year, sometime between August and December 16. See supra pp. 2-3. Even if section 170(f)(11) didn't apply, however, section 170(a) and DEFRA section 155 independently give the Secretary the authority to issue regulations defining a qualified appraisal, and our analysis would be substantially the same.

**[*8]** contributed property is a partial interest, the appraisal shall be of the partial interest." Sec. 1.170A-13(c)(2)(A), Income Tax Regs.

This is where the Evenchiks run into their first problem. Neither of their appraisals appraised the correct asset. Instead of appraisals of the Chateau stock contributed to FHR, the Evenchiks gave the Commissioner appraisals of the underlying assets that Chateau held. Moreover, the Evenchiks contributed to FHR only a partial interest in Chateau, and neither appraisal appraised the effect this might have on the value of the property donated.

Not appraising what was actually donated is a big problem, but not the only one. Section 1.170A-13(c)(3)(ii), Income Tax Regs., requires a qualified appraisal to include the following information:

> (A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;
>
> (B) In the case of tangible property, the physical condition of the property;
>
> (C) The date (or expected date) of contribution to the donee;
>
> (D) The terms of any agreement or understanding entered into * * * by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed * * *;

**[\*9]** (E) The name, address, and \* \* \* the identifying number of the qualified appraiser \* \* \*;

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised;

(I) The appraised fair market value \* \* \* of the property on the date (or expected date) of contribution;

(J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and

(K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

The two appraisals the Evenchiks used fall woefully short of meeting all of those requirements. For instance, the appraisals failed to:

- provide a description of the property in sufficient detail for a person who is not generally familiar with a partial interest in Chateau to ascertain that the property appraised was the property contributed-- which here of course it wasn't. See sec. 1.170A-13(c)(3)(ii)(A), Income Tax Regs;

- state the date or expected date of the contribution to FHR. See sec. 1.170A-13(c)(3)(ii)(C), Income Tax Regs.;

• include the terms of any agreement or understanding entered into by Harvey or FHR relating to the use of the donated property (e.g. stock-pledge agreement).  See sec. 1.170A-13(c)(3)(ii)(D), Income Tax Regs.;

• provide a statement that the appraisal was prepared for income tax purposes.  See sec. 1.170A-13(c)(3)(ii)(G), Income Tax Regs.; and

• give the appraised fair market value on the date (or expected date) of contribution.  See sec. 1.170A-3(c)(3)(ii)(I), Income Tax Regs.

We can only conclude that the Evenchiks didn't strictly comply with the regulations for a qualified appraisal.

II.   Substantial Compliance

This isn't necessarily the end of the game.  The Evenchiks argue that even though they didn't strictly comply with the regulation, they should still get a deduction because they substantially complied with it.  They build their argument on a foundation of cases beginning with Bond v. Commissioner, 100 T.C. 32 (1993), in which the taxpayers donated two blimps to charity.  In Bond, the taxpayers hired an appraiser, who filled out the relevant parts of the appraisal summary in section B of the Form 8283, but left out his qualifications.  Id. at 33-34. He later provided a list of them--he was a most well-qualified appraiser--at the beginning of the audit.  Id. at 34-35.  We found that the requirements of section

**[\*11]** 1.170A-13, Income Tax Regs., were directory rather than mandatory, and the

Bonds had substantially complied because:

> [The taxpayers] * * * met all of the elements required to establish the substance or essence of a charitable contribution, but merely failed to obtain and attach to their return a separate written appraisal * * * even though substantially all of the specified information except the qualifications of the appraiser appeared in the Form 8283 attached to the return. * * * [Id. at 41-42.]

Four years later in Hewitt v. Commissioner, 109 T.C. 258, 265 (1997), aff'd

without published opinion, 166 F.3d 332 (4th Cir. 1998), we built on Bond and

stated that the "key" question in substantial-compliance cases was whether "the

taxpayers had provided most of the information required, and the single defect in

furnishing everything required was not significant." We cited the legislative history

of DEFRA section 155 in Hewitt to show that Congress required a qualified

appraisal to give the Commissioner sufficient information to "deal more effectively

with the prevalent use of overvaluations." Hewitt, 109 T.C. at 265 (citing S. Prt. 98-

169 (Vol. I), at 444-45 (S. Comm. Print. 1984); Staff of Joint Comm. on Taxation,

General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984,

at 505-08 (J. Comm. Print 1985)).

Although not impossible post-Bond, see Consol. Investors Grp. v.

Commissioner, T.C. Memo. 2009-290, 2009 WL 4840246, at \*22-\*23 (substantial

**[\*12]** compliance even though appraisal obtained more than 60 days before contribution and without statement that it was prepared for income-tax purposes), taxpayers have had great difficulty in meeting the substantial-compliance standard. We recently listed some of their flaws in <u>Mohamed v. Commissioner</u>, T.C. Memo. 2012-152, 2012 WL 1937555, at \*7:

- failing to get an appraisal.  <u>See, e.g.</u>, <u>Todd v. Commissioner</u>, 118 T.C. 334, 336, 347 (2002).

- failing to fill out section B of Form 8283 (the appraisal summary).  <u>See, e.g.</u>, <u>Hewitt</u>, 109 T.C. at 260, 264.

- having someone without expertise in appraisals complete the appraisal. <u>See, e.g.</u>, <u>D'Arcangelo v. Commissioner</u>, T.C. Memo. 1994-572, 1994 WL 652230, at \*9.

- having an appraisal prepared after the return was filed.  <u>See, e.g.</u>, <u>Jorgenson v. Commissioner</u>, T.C. Memo. 2000-38, 2000 WL 134332, at \*4, \*8.

- including insufficient or inappropriate information in an appraisal.  <u>See</u> <u>Smith v. Commissioner</u>, T.C. Memo. 2007-368, 2007 WL 4410771, at \*19-20, <u>aff'd</u>, 364 Fed. Appx. 317 (9th Cir. 2009).

A taxpayer can't substantially comply with the qualified-appraisal requirements if the appraisal he submits fails to meet the "essential requirements of the governing statute."  <u>Estate of Clause</u>, 122 T.C. 115, 122 (2004).  The Evenchiks argue that the appraisals they submitted, "albeit for the corporation's underlying assets and not the common shares," do meet the essential requirements.  That's not

[*13] a tiny albeit; it's a hamartia--it misrepresents the actual property interest contributed.  An appraisal of the incorrect asset prevents the Commissioner from properly understanding and monitoring the claimed contribution.  See Smith, 2007 WL 4410771, at *20.

Indeed, the facts here are very similar to those in Smith, another case where we rejected a claim of substantial compliance.  The taxpayers in Smith argued that they substantially complied with the qualified-appraisal requirements for family limited partnership (FLP) interests which they had contributed to a charitable organization.  Id. at *12.  The only asset in the FLP interests donated was stock in a closely held, family-owned corporation called Beneco.  Id. at *2.  The taxpayers obtained two valuations that appraised the outstanding common stock in Beneco, but neither of those appraisals separately valued the taxpayers' FLP interests.  Id. at *6-*8.  We found it noteworthy that the appraisals were based on valuations of the Beneco stock, and--even though the values of the FLP interests were substantially dependent upon the Beneco stock values--that there was not a separate appraisal report for the FLP interests.  See id. at *17.  We found other problems--(1) the appraisals were not performed between 60 days before the contribution and the due dates of the returns; (2) one of the reports did not specifically state that it was prepared for income-tax purposes; (3) the reports did not contain the dates (or

**[*14]** expected dates) that the FLP interests were contributed or the values on those dates; and (4) the reports did not disclose the restrictions on the donee's right to use the donated property. Id. at *18.

We held that in light of these defects the taxpayers were not entitled to deductions for the contributions of their FLP interests. Id. at *19. We held that the appraisals did not fully or adequately describe the contributed property well enough to permit the Commissioner to understand the valuation methodology--missing information that was vitally important if the Commissioner was to understand and evaluate the claimed contributions. Id. at *19-*20. This led us to conclude that the Commissioner properly disallowed the claimed deductions. Id.

The Evenchiks have made the same mistake, and had the wrong asset appraised. Instead of valuing their contributed interest in Chateau, they valued Chateau's interest in two of its own assets--the apartment complexes. That miscue goes to the essence of the information required, because without knowing the specific property contributed the Commissioner is unable to determine whether the contributed property interest was overvalued. And the problem of misvalued property is so great that Congress was quite specific about what the charitably inclined have to do to defend their deductions. See Mohamed, 2012 WL 1937555,

**[\*15]** at \*10.  Indeed, that problem arose here--the parties stipulated that the Evenchiks overvalued their partial interest in Chateau by 35%.

Moreover, as it was in <u>Smith</u>, appraising the wrong asset was far from the only error in the appraisals that the Evenchiks submitted:  The appraisals also didn't state the date or expected date of the contribution or the fair market value on those dates, didn't provide a statement that the appraisal was prepared for income-tax purposes, and didn't include the terms of any agreement or understanding entered into by Harvey or FHR relating to the use of the donated property.  This is not a case where the taxpayers provided most of the information but left out one insignificant datum. <u>Cf.</u> <u>Hewitt</u>, 109 T.C. at 265.  This is a case where the appraisals had gaping holes of required information.  These defects prevented the Commissioner from properly evaluating the property interest contributed.  The Evenchiks are not, therefore, entitled to the deduction they seek.  The parties settled other issues, so

<u>Decision will be entered</u>

<u>under Rule 155</u>.