T.C. Memo. 2015-87

UNITED STATES TAX COURT

DAVID C. COSTELLO AND BARBARA A. COSTELLO, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24995-12.                    Filed May 6, 2015.

<u>Glen Michael Anderson</u> and <u>Michael G. Campbell</u>, for petitioners.

<u>Warren P. Simonsen</u> and <u>Christopher R. Moran</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>: Petitioners own a large farm in Howard County, Maryland. In 2006 they granted in favor of the county a land preservation easement on this property. By granting this easement, petitioners became entitled, as part of a "density exchange," to sell to a developer the development rights pertaining to

**[*2]** their parcel.  The developer paid them $2.56 million for these rights, which he then deployed elsewhere in Howard County.

On their Federal income tax return for 2006, petitioners reported a noncash charitable contribution of $5,543,309 on account of the easement.  Because they could not fully utilize this deduction for 2006, they also claimed carryover deductions for 2007 and 2008.  The Internal Revenue Service (IRS or respondent) disallowed these deductions, contending that petitioners had failed to satisfy regulatory reporting requirements for contributions of this type and that they lacked donative intent because the easement was part of a quid pro quo exchange.  The IRS accordingly determined deficiencies and accuracy-related penalties under section 6662(a)[1] as follows:

| Year | Deficiency | Penalty sec. 6662(a) |
|------|------------|----------------------|
| 2006 | $601,401 | $120,280 |
| 2007 | 588,577 | 117,715 |
| 2008 | 103,304 | 20,661 |

After concessions, three issues remain for decision.  First, we must decide whether petitioners are entitled to the claimed charitable contribution deductions.

___

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all dollar amounts to the nearest dollar.

**[*3]** Second, we must decide how gain on the sale of their development rights should be computed. Third, we must decide whether petitioners are liable for accuracy-related penalties.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated by this reference. Petitioners resided in Maryland when they filed their petition.

In April 2000 petitioners purchased Rose Hill Farm (Rose Hill) in Cooksville, Howard County, Maryland, for $1,682,556.[2] Rose Hill occupied 73.6 acres and included a working farm, a residence, and a three-car detached garage. Petitioners made numerous improvements to the property during the ensuing five years. They added a stone and pavement driveway, poured a concrete floor for the garage, replaced the roof of the main residence, thoroughly landscaped the area adjacent to the house, and made other capital improvements necessary to make the property a fully functional farm. We find that these improvements, corroborated by the expert report of Bruce Dumler, had an aggregate cost of $295,000. In early 2006 petitioners' total cost basis in Rose Hill was thus $1,977,556.

---

[2]Petitioners held title to Rose Hill through a disregarded entity, "Rose Hill Farm, LLC." For simplicity we will refer to petitioners as owning Rose Hill.

**[*4]** Howard County Agricultural Land Preservation Program

In 1992 Howard County enacted a set of zoning provisions designed to conserve farmland and preserve rural and scenic landscapes. These provisions created the Agricultural Land Preservation Program (ALPP). Through this program, the county acquires land preservation easements that restrict the exercise of development rights on qualified agricultural land. The objective of the ALPP is to keep the county's land base available for farming and, by clustering residential development elsewhere, minimize its impact on agricultural zones.

Under the ALPP, the county can acquire land preservation easements in three ways. First, it can purchase from a landowner the development rights pertaining to the property and then extinguish those rights. Second, a landowner can donate his development rights to the county; this has happened very rarely. Third, an easement can be placed on a landowner's property as a condition of his becoming entitled to sell his development rights to a third party. This latter option, referred to as a "density exchange option" (DEO), is the method relevant here.

The DEO allows residential density units to be exchanged between parcels by transferring development rights. A development right is essentially the right to create a residence; thus, if a parcel has five development rights, the owner has the right to develop five dwelling units on that parcel. The number of development

[*5] rights associated with a particular parcel, called the "sending parcel," depends on its gross acreage and zoning district. By purchasing development rights from a "sending parcel" and applying them to a "receiving parcel," a developer can achieve higher density on the latter than would otherwise be permitted.

A density exchange is negotiated between private parties, subject to approval by the Howard County Department of Planning and Zoning (DPZ). Before granting approval, DPZ considers zoning regulation compliance by both the sending and the receiving parcels. A sending parcel must be encumbered by a deed of easement meeting regulatory requirements before the DPZ will approve transfer of its development rights to a receiving parcel. A landowner participating in the DEO may sell some or all of his development rights. However, once he sells any rights, the easement that has been placed on his property eliminates all future development potential for that property.

Under Howard County zoning regulations, Rose Hill had 17 development rights attached to it "by right." Petitioners could have tried, if they had wished, to purchase additional development rights. Given Rose Hill's gross acreage, topography, and soil composition, and assuming that each lot could pass the "percolation" tests required for septic systems, the maximum realistic physical density of Rose Hill was 25 one-acre lots. Thus, if petitioners had elected to purchase eight

[*6] more development rights, they could have retained their residence and sought to develop Rose Hill to include up to 24 additional dwelling units.

Alternatively, petitioners had the option of participating in the ALPP. Landowners in Howard County are eligible to participate in this program if their property exceeds 20 acres and has soil characteristics that make it suitable for farming. Rose Hill met these requirements.

Petitioners' Participation in the ALPP

Petitioners first expressed interest in the ALPP in 2000, when they met with a DPZ representative to discuss selling their development rights to the county. In November 2001 Howard County offered to purchase the development rights associated with Rose Hill for $375,000. Petitioners did not accept this offer, in part because their lender had concerns about placing an easement on the property.

Petitioners thereafter investigated selling their development rights to private parties. On October 12, 2005, petitioners executed a contract to sell 15 of their 17 development rights to Kennard Warfield, a developer, for $2.4 million. This contract was later amended to extend the closing date and require Mr. Warfield to make a $1.2 million downpayment toward the purchase price. Petitioners subsequently agreed to sell another development right to Mr. Warfield, which increased the total purchase price to $2.56 million.

[*7]  In December 2005 the ALPP advised the county finance office that petitioners had contracted to sell their development rights and that Rose Hill would end up with a land preservation easement.  In January 2006 petitioners received the $1.2 million downpayment from Mr. Warfield.  They executed a deed of trust on their home to secure repayment of these funds if the sale of development rights did not close.

Under the ALPP petitioners could not transfer their development rights to Mr. Warfield until:  (1) the density sending plat and the density receiving plat were approved by Howard County; (2) an easement was placed on Rose Hill to restrict future development; and (3) all three documents were recorded in the county land records.  On June 6, 2006, the DPZ approved the density sending plat for Rose Hill and the density receiving plat for Mr. Warfield's parcel.  On June 22, 2006, petitioners submitted an application to dedicate an easement over Rose Hill to Howard County.  On July 7, 2006, the DPZ approved the transfer of Rose Hill into the ALPP.  On September 25, 2006, petitioners executed and delivered a Deed of Agricultural Land Preservation Easement (deed of easement), which the county accepted on October 6, 2006.

On October 17, 2006, Howard County gave final approval to the density sending and receiving plats.  On October 20, 2006, the deed of easement and the

[*8] plats transferring the development rights were recorded in Howard County land records. These documents state that they were being filed simultaneously to describe the conservation easement, convey it in perpetuity to Howard County, and sever the development rights from Rose Hill. Petitioners in due course received from Mr. Warfield the $1.36 million balance of the purchase price. Upon recordation of the deed of easement, all future development was prohibited for Rose Hill with the exception of farming.

Federal Tax Matters

In May 2007 petitioners retained Bruce Dumler to appraise Rose Hill before and after a hypothetical sale of development rights. Mr. Dumler assumed that petitioners could purchase eight additional development rights, which would give them a total of 25 development rights. He determined that the highest and best use of Rose Hill would be a residential subdivision with 25 dwelling units and that the fair market value of Rose Hill before the sale of the development rights was $7.69 million. He determined that the fair market value of Rose Hill after the sale of the development rights, for use as a working farm and residence, was $2.1 million.

Mr. Dumler issued his appraisal on July 1, 2007, and he listed December 1, 2006, as its effective date. His appraisal states his assumption that Rose Hill was, as of December 1, 2006, "free and clear of any or all liens or encumbrances." His

[*9] appraisal does not mention the deed of easement, and it does not purport to value an easement. Rather, his appraisal states that "the property rights appraised comprise the fee simple interest in the subject property," which he determined to be worth $5.59 million net of petitioners' residence.

Mr. Dumler's appraisal recites that petitioners in October 2005 had "contracted to sell 15 density units to Kennard Warfield." However, because he had been asked to address a "valuation scenario represent[ing] a hypothetical condition," his appraisal takes no account of the $2.56 million that petitioners received from Mr. Warfield. At the time he performed his appraisal, moreover, Mr. Dumler apparently was not informed of several important facts. These included the facts that: (1) petitioners had placed a land preservation easement on Rose Hill, which was recorded on October 20, 2006; (2) petitioners were required to place this easement on Rose Hill as a condition of securing permission from Howard County to sell their development rights; and (3) a portion of Rose Hill had failed at least one "percolation" test, which raised questions about its ability to support as many as 25 dwelling units.

Before filing their 2006 tax return, petitioners asked Howard County to sign Form 8283, Noncash Charitable Contributions, as the recipient of the easement. Howard County declined to sign this form. The county's attorney informed peti-

[*10] tioners by letter that the county would first need an opinion of a qualified tax professional addressing "the ability to take a charitable contribution deduction under section 170(h)." The letter also asked petitioners to confirm their use of a qualified appraiser and their understanding that "if the donation has no material effect on the real property's value, * * * no deduction is allowable." Without such opinion and confirmation, the county could not verify petitioners' claim to a noncash charitable contribution and would not sign the Form 8283.

Petitioners' 2006 Federal income tax return, prepared by Glenn Hollrah, their certified public accountant (C.P.A.), was timely filed on October 15, 2007. The return reported a noncash charitable contribution deduction of $5,543,309; in support of this deduction, the return included an unsigned Form 8283 referring to the easement and a copy of Mr. Dumler's July 1, 2007, appraisal. The return claimed no cost basis in the development rights sold to Mr. Warfield and reported a long-term capital gain of $1,029,441 on that sale. This reported gain corresponded to the cash petitioners got from Mr. Warfield; they claimed like-kind exchange treatment for the balance of the $2.56 million purchase price, consisting of land valued at $1,530,559.

After Howard County declined to sign the Form 8283, Mr. Dumler prepared at petitioners' request an addendum to his original appraisal. This addendum, da-

[*11] ted March 25, 2008, recites that he had "valued the conservation easement which has been contributed to Howard County by the property owner." In the addendum Mr. Dumler reduced the $5,543,309 value that his original appraisal had placed on the development rights in order to account for the $2.56 million that Mr. Warfield had paid petitioners for those rights. On the basis of this and other changes, Mr. Dumler concluded that the easement should be valued at $3.03 million.

As Howard County had requested, petitioners obtained and supplied to the county an opinion letter from Mr. Hollrah, their C.P.A. This letter opined, on the basis of Mr. Dumler's appraisal and the March 25, 2008, addendum thereto, that petitioners' conveyance of the easement qualified for a charitable contribution deduction under section 170(h). After reviewing these documents, an officer of Howard County executed a Form 8283 attesting to receipt of the easement.

On May 16, 2008, petitioners filed an amended 2006 return. The amended return reduced their noncash charitable contribution deduction to $3,004,692.[3] It included the new Form 8283 signed by Howard County and attached copies of Mr.

---

[3]Because the easement did not cover the portion of Rose Hill consisting of their residence, petitioners made a pro rata adjustment that reduced by $25,308 Mr. Dumler's revised value of $3.03 million.

**[\*12]** Dumler's original appraisal and his March 25, 2008, addendum thereto.  Mr. Hollrah prepared the amended return and the revised Form 8283.

Because of statutory limitations, petitioners were unable to claim the entire charitable contribution deduction for 2006.  They thus deducted $1,058,643 on their amended 2006 return and $1,666,528 on their 2007 return, which was timely filed on October 20, 2008.  They deducted the balance of the contribution, or $278,521, on their 2008 return, which was timely filed on October 20, 2009.

On July 13, 2012, respondent timely issued a notice of deficiency for 2006-2008.  This notice disallowed the charitable contribution deductions claimed for the conservation easement; disallowed like-kind exchange treatment on the sale of development rights because petitioners failed to close on replacement property within 180 days, see sec. 1031(a)(3); disallowed the deductions claimed for business use of their home; and determined accuracy-related penalties with respect to all of these adjustments.  Petitioners timely petitioned this Court for redetermination of these deficiencies and penalties.  Their petition challenges respondent's disallowance of the charitable contribution deductions; asserts that they are entitled to a higher basis offsetting the capital gain reported on the sale of the development rights; and disputes the accuracy-related penalties (other than those attributable to disallowance of their home office deductions).

**[\*13]**                                        OPINION

I.      Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving those determinations erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and taxpayers must demonstrate their entitlement to the deductions claimed. Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). The burden of proof on factual issues may be shifted to the Commissioner if the taxpayer introduces "credible evidence" with respect thereto and satisfies recordkeeping and other requirements. Sec. 7491(a)(1) and (2).

Before trial petitioners moved to shift the burden of proof to respondent. Upon the record before us, we cannot find that petitioners have established their satisfaction of the recordkeeping and substantiation requirements set forth in section 7491(a)(2). The burden of proof thus remains on them.

II.     Charitable Contribution Deductions

Section 170(a)(1) allows a deduction for any charitable contribution paid within the taxable year. "The sine qua non of a charitable contribution is a transfer of money or property without adequate consideration." United States v. Am. Bar

[*14] Endowment, 477 U.S. 105, 118 (1986).  If the taxpayer makes a charitable contribution of property other than money, the amount of the contribution is generally equal to the fair market value of the property at the time of the contribution.  See sec. 1.170A-1(c)(1), Income Tax Regs.

A charitable contribution deduction generally is not allowed for a gift of property consisting of less than the donor's entire interest in that property, but there is an exception for (among other things) a "qualified conservation contribution."  Sec. 170(f)(3)(A), (B)(iii).  This exception applies where:  (1) the taxpayer makes a contribution of a "qualified real property interest," (2) the donee is a "qualified organization," and (3) the contribution is "exclusively for conservation purposes."  Sec. 170(h)(1).

Where the value of contributed property exceeds $500,000, no deduction is allowed unless the taxpayer obtains a "qualified appraisal" and attaches it to his return.  Sec. 170(f)(11)(D).  A qualified appraisal is "an appraisal of such property which * * * is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed" by the Secretary of the Treasury.  Sec. 170(f)(11)(E)(i)(II).  Any taxpayer claiming a deduction for a contribution of property whose value exceeds $5,000 must also attach to his return a fully completed "appraisal summary."  See sec. 1.170A-

**[*15]** 13(c)(2), Income Tax Regs.  The IRS has prescribed Form 8283 to be used as the "appraisal summary."  Jorgenson v. Commissioner, T.C. Memo. 2000-38, 79 T.C.M. (CCH) 1444, 1450.

Respondent contends that petitioners' claimed charitable contribution deductions were properly disallowed for three distinct and independent reasons: (1) Mr. Dumler's appraisal issued July 1, 2007, was not a "qualified appraisal"; (2) the Form 8283 accompanying petitioners' original return was not a valid "appraisal summary"; and (3) petitioners lacked donative intent because the easement they granted Howard County was part of a quid pro quo exchange.  We consider these arguments in turn below, as well as the "substantial compliance" reply that petitioners make to the first two arguments.

A.    Reporting Requirements

1.    Qualified Appraisal

The requirements for a "qualified appraisal" are set forth in section 1.170A-13(c)(3), Income Tax Regs.  To be "qualified," an appraisal must be made no more than 60 days before the gift and no later than "the due date (including extensions) of the return on which a deduction is first claimed * * * with respect to the donated property."  Id. subdivs. (i)(A), (iv)(B).  Petitioners first claimed a deduction for the contribution of the easement on their original 2006 return filed on October 15,

[*16] 2007. In determining whether petitioners had a "qualified appraisal," therefore, we must focus on Mr. Dumler's original appraisal, dated July 1, 2007, which was attached to that return. The March 25, 2008, addendum to Mr. Dumler's appraisal was made more than five months after the extended due date of petitioners' 2006 return; that addendum cannot be considered in determining whether they had a "qualified appraisal." See Friedman v. Commissioner, T.C. Memo. 2010-45, 99 T.C.M. (CCH) 1175, 1177 (finding that appraisals performed after the due dates of the relevant returns did not satisfy the "qualified appraisal" requirement); Jorgenson, 79 T.C.M. (CCH) at 1448, 1451 (same); cf. sec. 1.170A-13(c)(3)(i), (iv)(B), Income Tax Regs. (stating that, where a deduction is first claimed on an amended return, the qualified appraisal must be made no later than the date the taxpayer files the amended return).

The regulations state that a "qualified appraisal" must include numerous specific items of information. We agree with respondent that Mr. Dumler's July 1, 2007, appraisal is not "qualified" because it fails to include three of the required elements: an accurate description of the property contributed; the date of the contribution; and the salient terms of the agreements among petitioners, Mr. Warfield, and Howard County. See sec. 1.170A-13(c)(3)(ii)(A), (C), (D), Income Tax Regs.

[*17] A "qualified appraisal" must include "[a] description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed." Sec. 1.170A-13(c)(3)(ii)(A), Income Tax Regs. The purpose of this requirement is to provide the IRS with information sufficient to evaluate claimed deductions and assist it in detecting overvaluations of donated property. See Smith v. Commissioner, T.C. Memo. 2007-368, 94 T.C.M. (CCH) 574, 586 (citing Hewitt v. Commissioner, 109 T.C. 258, 265 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998)), aff'd, 364 Fed. Appx. 317 (9th Cir. 2009).

Mr. Dumler's original appraisal does not use the words "conservation easement" or "land preservation easement." Indeed, the only reference to easements in his July 1, 2007, appraisal is the statement that he was "not aware of any easements or encroachments on the site." This indicates that Mr. Dumler was unaware of the deed of easement that petitioners transferred to Howard County on October 6, 2006, which was recorded in its land records office on October 20, 2006. As stated on their Form 8283, the property that petitioners allegedly contributed to Howard County was a conservation easement. But the appraisal does not describe, or purport to value, a conservation easement; rather, it states that "the property rights appraised comprise the fee simple interest in the subject property." It would

**[*18]** be extremely difficult for a person reading this appraisal "to ascertain that the property that was appraised is the property that was (or will be) contributed." Sec. 1.170A-13(c)(3)(ii)(A), Income Tax Regs.

A qualified appraisal must also include "[t]he date (or expected date) of contribution to the donee." Sec. 1.170A-13(c)(3)(ii)(C), Income Tax Regs. Providing the contribution date is important because it enables the IRS to determine whether the appraisal was timely performed. See Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34 (finding that, among other defects, an appraisal failing to specify the contribution date was not a qualified appraisal and did not substantially comply with the regulations); Lord v. Commissioner, T.C. Memo. 2010-196 (same); Smith, T.C. Memo. 2007-368 (same); Sergeant v. Commissioner, T.C. Memo. 1998-265, 76 T.C.M. (CCH) 133, 135 (finding that an appraisal that failed to specify the contribution date was not a "qualified appraisal").

Mr. Dumler's original appraisal illustrates his familiarity with the mechanics of property development. But because he was not purporting to value an easement, it is not surprising that he fails to mention any of the relevant dates. The appraisal has an effective date of December 1, 2006, which is neither the date petitioners executed the deed of easement (September 25, 2006), nor the date they transferred the easement to Howard County (October 6, 2006), nor the date the

[*19] easement was recorded (October 20, 2006). His appraisal does not supply the date of the contribution and does not value the contributed property as of that date.

Finally, a "qualified appraisal" must include "[t]he terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed." Sec. 1.170A-13(c)(3)(ii)(D), Income Tax Regs. Information concerning such agreements is essential to enable the IRS to evaluate (for example) whether the donors have received or will receive something in exchange for their gift. See Smith, 94 T.C.M. (CCH) at 586 ("Congress mandated the reporting information so that the Internal Revenue Service * * * could monitor and address congressional concerns about overvaluation[.]"). Mr. Dumler's appraisal omits any mention of the facts that petitioners conveyed an easement to Howard County and that they were required to convey that easement as a condition of being permitted to sell their development rights to Mr. Warfield.

These omissions were not trivial, formal, or mechanical. Because of them, the appraisal failed to inform the IRS of the essence of the transaction in which petitioners engaged. Because the July 1, 2007, appraisal did not provide an accurate description of the property contributed, did not specify the date of the contribu-

**[\*20]** tion, and did not inform the IRS of the salient terms of the agreements among petitioners, Howard County, and Mr. Warfield, we find that it was not a "qualified appraisal" within the meaning of section 1.170A-13(c)(3)(i), Income Tax Regs.

2.    Appraisal Summary

For contributions of property whose value exceeds $5,000, a fully completed appraisal summary must be attached to the return on which the contribution deduction is first claimed.  Sec. 1.170A-13(c)(2)(i)(B), Income Tax Regs.  An appraisal summary on Form 8283 must (among other things) be "signed and dated * * * by the donee" and set forth specified information, including "a statement explaining * * * the amount of any consideration received from the donee for the contribution."  Id. subpara. (4)(i)(B), (ii)(H).  The Form 8283 accompanying petitioners' original 2006 return fails these two requirements.

First, the appraisal summary was not "signed and dated" by Howard County as donee.  The signature of the donee is important because it attests to the fact that a charitable contribution was actually made.  And the absence of this signature was not an accident or oversight.  Howard County explicitly declined to sign the

**[\*21]** Form because it had genuine doubts about petitioners' "ability to take a charitable contribution deduction under section 170(h)."[4]

A valid appraisal summary must also include "a statement explaining * * * the amount of any consideration received from the donee for the contribution." Sec. 1.170A-13(c)(4)(ii)(H), Income Tax Regs.  Information concerning the existence of a return benefit is of central importance to the IRS because "[t]he sine qua non of a charitable contribution is a transfer of money or property without adequate consideration."  Am. Bar Endowment, 477 U.S. at 118.  An important goal of the appraisal summary regulations is to "foster disclosure of 'dual payment' and quid pro quo contributions."  Boone Operations Co. v. Commissioner, T.C. Memo. 2013-101, at \*18-\*19 (quoting Viralam v. Commissioner, 136 T.C. 151, 171 (2011)).

Petitioners received "consideration" from Howard County in return for the easement, namely, the county's permission to sell 16 development rights to Mr.

---

[4]The absence of a signature on the Form 8283 may be excused "[i]n rare and unusual circumstances in which it is impossible for the taxpayer to obtain the signature of the donee."  Sec. 1.170A-13(c)(4)(iv)(C)(2), Income Tax Regs.  Howard County accepted the easement on October 6, 2006, and petitioners did not file their 2006 tax return until October 15, 2007.  Petitioners had more than a year to satisfy whatever concerns Howard County had about the transaction, and they have not shown that it was impossible for them to obtain the signature of a county representative within that time.

[*22] Warfield, which petitioners otherwise could not have done. The Form 8283 accompanying their original return disclosed neither the quid pro quo they received from the county nor the $2.56 million they received from Mr. Warfield. Because the Form 8283 failed to include the donee's signature and failed to disclose the consideration petitioners received from the donee, their appraisal summary did not comply with the regulations.[5]

### 3. Substantial Compliance

In Bond v. Commissioner, 100 T.C. 32, 41 (1993), we held that the reporting requirements of section 1.170A-13, Income Tax Regs., while "helpful to respondent in the processing and auditing of returns on which charitable deductions are claimed," are "directory and not mandatory." Thus, in appropriate circumstances, these requirements can be satisfied by substantial, rather than by literal, compliance. Bond, 100 T.C. at 42; see Hewitt, 109 T.C. at 265 & n.10 (stating

---

[5]Petitioners contend that their deduction can be justified on the alternative theory that they made a "bargain sale." See infra pp. 28-30. But their Form 8283 did not disclose a "bargain sale" either. See sec. 1.170A-13(c)(4)(ii)(H), Income Tax Regs. (an appraisal summary must include "a statement explaining whether or not the charitable contribution was made by means of a bargain sale"). We have previously held that failure to describe a bargain sale on Form 8283 "may foreclose a claimed charitable contribution deduction in its entirety." Seventeen Seventy Sherman St., LLC v. Commissioner, T.C. Memo. 2014-124, at *21 n.25; see Viralam v. Commissioner, 136 T.C. 151, 171 (2011); Boone Operations Co. v. Commissioner, T.C. Memo. 2013-101, at *21.

**[\*23]** that substantial compliance is shown where "the taxpayers had provided most of the information required" or made omissions "solely through inadvertence"). Taken together, <u>Bond</u> and <u>Hewitt</u> "provide a standard by which we can consider whether petitioners provided sufficient information to permit respondent to evaluate their reported contributions, as intended by Congress." <u>Smith</u>, 94 T.C.M. (CCH) at 586.

The substantial compliance doctrine "should not be liberally applied." <u>Alli v. Commissioner</u>, T.C. Memo. 2014-15, at \*54; <u>accord</u> <u>Mohamed v. Commissioner</u>, T.C. Memo. 2012-152, 103 T.C.M. (CCH) 1814, 1820-1821 ("[T]he problems of misvalued property are so great that Congress was quite specific about what the charitably inclined have to do to defend their deduction[.]"); <u>see</u> <u>Kaufman v. Shulman</u>, 687 F.3d 21, 22 (1st Cir. 2012) (the substantial compliance doctrine may be used to forgive "minor discrepancies" in the taxpayer's reporting), <u>aff'g in part, vacating in part, and remanding in part</u> 136 T.C. 294 (2011), <u>and</u> 134 T.C. 182 (2010); <u>Prussner v. United States</u>, 896 F.2d 218, 224 (7th Cir. 1990) (the substantial compliance doctrine "should be interpreted narrowly"). "The substantial compliance doctrine is not a substitute for missing entire categories of content; rather, it is at most a means of accepting a nearly complete effort that has simply fallen short in regard to minor procedural errors or relatively unimportant clerical

**[\*24]** oversights." Hendrix v. United States, No. 2:09-cv-132, 2010 WL 2900391, at \*5 (S.D. Ohio July 21, 2010).

We have declined to apply the substantial compliance doctrine where the taxpayer's reporting fails to meet substantive requirements set forth in the regulations[6] or omits entire categories of required information.[7] Petitioners' original appraisal and Form 8283 suffer from both of these defects. Those documents omit numerous categories of important information, including an accurate description

---

[6]See, e.g., Hewitt, 109 T.C. at 260, 264 (the taxpayer did not "substantially comply" where he did not supply a qualified appraisal or an appraisal summary); Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34, at \*12-\*15 (the taxpayer did not "substantially comply" where he submitted an appraisal of the wrong property); Rothman v. Commissioner, T.C. Memo. 2012-218, slip op. at 10 (the taxpayer did not "substantially comply" where the appraisal valued "a property right different from the one petitioners contributed"); D'Arcangelo v. Commissioner, T.C. Memo. 1994-572, 68 T.C.M. (CCH) 1223, 1230 (1994) (the taxpayer did not "substantially comply" where he obtained an appraisal from a nonqualified appraiser).

[7]See, e.g., Estate of Evenchik, at \*9-\*10 (the taxpayer did not "substantially comply" where the appraisal omitted an accurate description of the contributed property, the contribution date, and the terms of an agreement relating to its disposition); Lord v. Commissioner, T.C. Memo. 2010-196, 100 T.C.M. (CCH) 201, 202 (the taxpayer did not "substantially comply" where the appraisal omitted the contribution date, the appraisal performance date, and the fair market value as of the contribution date); Friedman v. Commissioner, T.C. Memo. 2010-45, 99 T.C.M. (CCH) 1175, 1177 (the taxpayer did not "substantially comply" where the appraisal omitted, inter alia, an adequate description of the donated property); Smith, 94 T.C.M. (CCH) at 585 (the taxpayer did not "substantially comply" where the appraisal omitted, inter alia, the contribution date and disclosure of restrictions on use of the property).

[*25] of the contributed property, the salient terms of the agreements among the parties, a signature of the donee attesting to receipt of a contribution, an explanation of the quid pro quo petitioners received, and the date of the contribution.[8]

Because Mr. Dumler's original appraisal values "the fee simple interest" in Rose Hill before and after a hypothetical sale of development rights, it does not value the correct asset, namely, the land preservation easement conveyed to Howard County. An appraisal of the wrong asset cannot "substantially comply" with the regulatory reporting requirements because it prevents the Commissioner from properly understanding and evaluating the claimed contribution. Estate of Evenchik, T.C. Memo. 2013-34, at *12-*13; Rothman v. Commissioner, T.C. Memo. 2012-218, slip op. at 10. These defects lead us to conclude that petitioners do not fall under the protective umbrella of substantial compliance.[9]

---

[8]Because petitioners' original Form 8283 disclosed the date of the alleged contribution, the absence of that information from the appraisal would not, standing alone, be fatal. See Zarlengo v. Commissioner, T.C. Memo. 2014-161, at *36 (finding that taxpayers substantially complied by disclosing contribution date on appraisal summary); Simmons v. Commissioner, T.C. Memo. 2009-208, 98 T.C.M. (CCH) 211, 215, aff'd, 646 F.3d 6 (D.C. Cir. 2011) (same).

[9]Even absent strict or substantial compliance with the "qualified appraisal" and reporting requirements, a deduction will not be denied if the failure to meet those requirements is due to "reasonable cause and not to willful neglect." Sec.

(continued...)

**[\*26]** B.     Quid Pro Quo

Petitioners' failure to supply a "qualified appraisal" and a valid appraisal summary with their original 2006 return constitutes sufficient grounds for disallowing their charitable contribution deductions. However, assuming arguendo that petitioners had substantially complied with the regulations' reporting requirements, we would uphold respondent's disallowance of those deductions on the merits. Examining the transactions under the standards set forth in Hernandez v. Commissioner, 490 U.S. 680 (1989), we conclude that petitioners conveyed the easement to Howard County as part of a quid pro quo exchange.

The Supreme Court in Hernandez stated that "[t]he relevant inquiry in determining whether a payment is a 'contribution or gift' under § 170 is * * * whether the transaction in which the payment is involved is structured as a quid pro quo exchange." Hernandez, 490 U.S. at 701-702. In examining whether a transfer was made with the expectation of a quid pro quo, we give most weight to

---

[9](...continued)
170(f)(11)(A)(ii)(II). The burden of proving reasonable cause is on the taxpayer. Rule 142(a). Given the magnitude of the omissions from the appraisal and Form 8283, particularly the failure to disclose the prior sale of their development rights for $2.56 million, petitioners cannot show reasonable cause. See Pollard v. Commissioner, T.C. Memo. 2013-38, at \*31-\*32 (where the return preparer was unaware that the conveyance of a conservation easement was part of a quid pro quo arrangement, the taxpayers could not claim reasonable cause as a defense).

**[\*27]** the external features of the transaction, avoiding imprecise inquiries into taxpayers' subjective motivations. See id. at 690-691; Christiansen v. Commissioner, 843 F.2d 418, 420 (10th Cir. 1988). If it is understood that the property will not pass to the charitable recipient unless the taxpayer receives a specific benefit, and if the taxpayer cannot garner that benefit unless he makes the required "contribution," the transfer does not qualify the taxpayer for a deduction under section 170. See Christiansen, 843 F.2d at 420-421; Graham v. Commissioner, 822 F.2d 844, 849 (9th Cir. 1987), aff'g 83 T.C. 575 (1984), aff'd sub nom. Hernandez v. Commissioner, 490 U.S. 680 (1989).

The external features of the transaction show that petitioners granted an easement to Howard County in exchange for the county's granting them permission to sell their development rights. Under the ALPP, petitioners could not transfer their development rights to Mr. Warfield until the density sending and receiving plats were approved by Howard County and an easement was placed on Rose Hill to restrict future development. Petitioners would not have conveyed the easement unless they received permission to sell their development rights; and they could not legally sell their development rights unless they executed the deed of easement. Petitioners' transaction thus bears the classic features of a quid pro quo exchange as defined in Hernandez and its progeny. See, e.g., Rolfs v. Commis-

[*28] <u>sioner</u>, 135 T.C. 471 (2010), <u>aff'd</u>, 668 F.3d 888 (7th Cir. 2012); <u>Seventeen Seventy Sherman St., LLC v. Commissioner</u>, T.C. Memo. 2014-124; <u>Pollard v. Commissioner</u>, T.C. Memo. 2013-38.

Petitioners seek to defend their charitable contribution on an alternative theory, namely, that they made a "bargain sale" to Howard County. They ask that we collapse the various transactions and treat them as having sold their 16 development rights directly to Howard County for $2.56 million. By doing so, petitioners supposedly gave up the right to develop Rose Hill into a residential community with 25 one-acre lots, which (net of their retained residence) would have been worth $5.59 million according to Mr. Dumler. Petitioners thus contend that they sold their development rights to Howard County for $3.03 million less than those rights were worth, generating a charitable contribution in that amount.

We reject petitioners' invitation to recharacterize their transaction. Howard County's zoning regulations specify three distinct methods by which landowners can participate in the ALPP: donating their development rights to the county, selling their development rights to the county, or placing an easement on their land as a condition of selling their development rights to someone else. Petitioners considered the second option during 2000-2001 but rejected the county's offer to purchase their development rights for $375,000. Petitioners then embraced the third

[*29] option, placing an easement on Rose Hill as a condition of selling their development rights to Mr. Warfield for $2.56 million.  The three methods specified in the zoning regulations are distinct in legal, practical, and economic terms.  Having opted for the third method, petitioners cannot plausibly contend that they should be deemed to have opted for the second method.

In any event, petitioners' argument would be unpersuasive even if we were to recharacterize the transaction as they suggest.  Because Rose Hill had failed at least one "percolation" test for septic systems, there is no support in the record for Mr. Dumler's assumption that the property could be developed into 25 one-acre lots.  And even if the property could support 24 lots in addition to petitioners' resi-dence, they would have had to purchase eight additional development rights to ex-ecute that plan.  They did not establish their ability to do this.[10]

---

[10]The March 25, 2008, addendum to Mr. Dumler's appraisal also appears to suffer from a methodological flaw.  By selling 16 development rights to Mr. War-field for $2.56 million, petitioners conveyed to him the right to enjoy the profit from the ultimate sale of the corresponding 16 dwelling units.  Mr. Dumler conclu-ded that the highest and best use of Rose Hill would have been as a residential subdivision with 25 dwelling units, which he valued at $5.59 million net of peti-tioners' retained residence.  By subtracting $2.56 million from that value, Mr. Dumler assumed that petitioners would enjoy the profit from the ultimate sale of all 24 dwelling units, despite the fact that they had conveyed to Mr. Warfield the right to enjoy the profit from the sale of the 16 units corresponding to the 16 development rights he had purchased.  There is no logical or evidentiary support for this assumption.

**[*30]** Petitioners' "bargain sale" theory also lacks support in a more fundamental sense.  In essence, petitioners are contending that they donated to Howard County the development potential of Rose Hill to the extent it exceeded the value of the 16 development rights they sold to Mr. Warfield.  But petitioners never acquired the eight additional development rights they would have needed; instead, they executed a contract to sell to Mr. Warfield all the development rights they had.  Petitioners and Mr. Warfield could not close on this contract until an easement was placed on Rose Hill, the effect of which would be to bar any future development on that property.  In a practical economic sense, therefore, Rose Hill had no further development potential once petitioners had executed their contract with Mr. Warfield.  As a result, there was no "excess" development potential that petitioners could contribute to Howard County through a bargain sale.  Petitioners thus could not carry their burden of proving the amount of the charitable contribution even if we adopted their "bargain sale" theory.

III.   Gain From the Sale of Development Rights

Gross income means all income from whatever source derived, including gains derived from dealings in property.  Sec. 61(a)(3).  Gain from the sale or exchange of property must be recognized unless the Code provides otherwise.

[*31] Sec. 1001(c). Section 1001(a) defines gain from the sale of property as the excess of the amount realized over the adjusted basis of the property sold.

The amount realized is the sum of any money received plus the fair market value of any property received. Sec. 1001(b); Chapin v. Commissioner, 12 T.C. 235, 238 (1949), aff'd, 180 F.2d 140 (8th Cir. 1950). The parties agree that petitioners sold their development rights to Mr. Warfield for $1,029,441 in cash and property worth $1,530,599. Their "amount realized" was thus $2.56 million.

Although petitioners on their 2006 tax return claimed no basis in the development rights, the parties agree that petitioners are entitled to a basis. A taxpayer's basis in property is generally its cost. Sec. 1012. Generally, where a portion of a larger property is sold, the cost of the entire property is "equitably apportioned among the several parts." W.C. & A.N. Miller Dev. Co. v. Commissioner, 81 T.C. 619, 632 (1983); sec. 1.61-6(a), Income Tax Regs.

The parties agree that "equitable apportionment" should not be applied here and that petitioners' basis in their development rights should instead be determined under Revenue Ruling 77-414, 1977-2 C.B. 299. That ruling considers the sale of development rights pertaining to a parcel of farmland under circumstances resembling those here. "Under the circumstances," the ruling concludes, "it is not possible to allocate the basis in the agricultural property between the development

[*32] right to be conveyed and the interests to be retained." Ibid. "Since it is not possible to determine the basis of the development right, the amount received in consideration for the transfer of the development right * * * should be applied to reduce the taxpayer's basis in such land." Id. at 301. Gain is recognized to the extent the amount realized exceeds the taxpayer's basis in the entire property. See Inja Land Co. v. Commissioner, 9 T.C. 727 (1947), acq., 1948-1 C.B. 2; Rev. Rul. 68-291, 1968-1 C.B. 351.

Petitioners' original cost basis in Rose Hill was $1,682,556. Section 1016 provides that a basis shall be adjusted "for expenditures * * * properly chargeable to capital account." We have determined that petitioners made capital improvements with a cost of $295,000 to Rose Hill during 2000-2005. Petitioners thus realized on the sale of their development rights a long-term capital gain of $582,444, that is, $2,560,000 - [$1,682,556 + $295,000].

IV.  Penalties

Section 6662 imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to negligence, a substantial understatement of income tax, or a substantial valuation misstatement. Given petitioners' concessions and our findings above, the remaining question is whether

**[\*33]** petitioners are liable for the accuracy-related penalty with respect to the disallowed charitable contribution deductions.

Section 6662(b)(2) imposes a 20% penalty on any underpayment attributable to any "substantial understatement of income tax." An understatement is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return. Sec. 6662(d)(1)(A). Under section 7491(c), the Commissioner bears the burden of production with respect to the liability of an individual for any penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). In the notice of deficiency, respondent determined deficiencies of $601,401, $588,577, and $103,304 for 2006, 2007, and 2008, respectively. If the Rule 155 computations confirm a substantial understatement, respondent will have carried his burden of production. See Cooper v. Commissioner, 143 T.C. __ (Sept. 23, 2014).

Section 6664(c)(1) generally provides that the accuracy-related penalty shall not be imposed with respect to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to * * * [it]." The taxpayer bears the burden of proving reasonable cause and good faith. Higbee, 116 T.C. at 446-447. Reasonable cause can be shown by good-faith reliance on the advice of a qualified tax professional. Sec. 1.6664-4(b)(1), (c), Income Tax Regs. To justify such reliance, "[t]he advice must

**[\*34]** be based upon all pertinent facts and circumstances." Id. para. (c)(1)(i). The reliance defense is not available "if the taxpayer fails to disclose a fact that * * * [he] knows, or reasonably should know, to be relevant to the proper tax treatment of an item." Ibid.

Mr. Dumler's original appraisal did not take into account "all pertinent facts and circumstances"--chiefly, the facts that petitioners had conveyed an easement to Howard County as a condition of selling their development rights to Mr. Warfield. As a result, Mr. Dumler's original appraisal valued the wrong property and significantly overvalued their charitable contribution. Mr. Hollrah then prepared their 2006 return in reliance on Mr. Dumler's appraisal. Petitioners knew or reasonably should have known that the sale of their development rights for $2.56 million was relevant in determining the charitable contribution deduction to which they would be entitled. Because the advice petitioners initially received from their tax advisers failed to take account of critically important facts, they do not qualify for the "reasonable cause" defense for 2006. See Pollard v. Commissioner, T.C. Memo. 2013-38, at \*31-\*32. We accordingly sustain respondent's imposition of

[*35] the accuracy-related penalty with respect to the disallowed charitable
contribution deduction for 2006.[11]

Tax years 2007 and 2008 require a closer analysis. By the time petitioners
filed their 2007 and 2008 returns claiming the carryover contribution deductions,
they were in possession of Mr. Dumler's March 25, 2008, addendum, which de-
scribed the easement and acknowledged the sale of development rights to Mr.
Warfield. They were in possession of Mr. Hollrah's opinion letter, which opined
that they were entitled to claim a reduced charitable contribution deduction on the
basis of that addendum. And they were in possession of a new Form 8283 that
was signed and dated by Howard County.

We assume without deciding that petitioners had "good cause" and "acted in
good faith" with respect to the 2007-2008 carryover contribution deductions. See
sec. 6664(c)(1). However, respondent has determined with respect to these deduc-
tions the 20% penalty for "substantial valuation misstatement" under section
6662(b)(3).[12] In the case of this penalty, the "reasonable cause" defense is not

_____

[11]In judging a taxpayer's liability for a penalty, we assess his good faith and
reasonable reliance as of the date his original return was filed, without regard to
any amended return for that year. See Perrah v. Commissioner, T.C. Memo. 2002-
283, 84 T.C.M. (CCH) 547.

[12]Respondent notes that the complete disallowance of petitioners' claimed
(continued...)

**[\*36]** available unless two additional conditions are met.  First, the property's claimed value must be "based on a qualified appraisal made by a qualified appraiser."  Second, the taxpayer, besides obtaining such an appraisal, must have "made a good faith investigation of the value of the contributed property."  Sec. 6664(c)(3).

Section 6662(e)(1)(A) provides that a valuation misstatement is "substantial" if the value claimed on the return is "150 percent or more of the amount determined to be the correct amount."  We have found that the value of the conservation easement petitioners donated to Howard County had a value of zero or nearly zero.  Because Rose Hill had no further development potential once petitioners executed their contract with Mr. Warfield, Rose Hill had no "excess" development potential that petitioners could contribute to Howard County.  In any event, the easement was not worth $3,004,692 as claimed on petitioners' 2007 and 2008 returns, nor was it worth $2,003,128, the threshold value required to avoid a substantial valuation misstatement.

---

[12](...continued)
charitable contribution deductions arguably gives rise to a "gross valuation misstatement," which under section 6662(h)(1) would increase the accuracy-related penalty from 20% to 40%.  However, in the notice of deficiency respondent determined only a 20% penalty, and he has elected not to amend his answer to assert the larger amount.

**[\*37]** Section 6664(c)(4)(B) provides that "[t]he term 'qualified appraisal' has the meaning given such term by section 170(f)(11)(E)(i)." Section 170(f)(11)(E)(i) provides that a "qualified appraisal" is an appraisal that "is treated for purposes of this paragraph as a qualified appraisal under regulations * * * prescribed by the Secretary." As noted earlier, an appraisal can be "qualified" under those regulations only if it is "received by the donor before the due date * * * of the return on which a deduction is first claimed * * * with respect to the donated property." Sec. 1.170A-13(c)(3)(iv)(B), Income Tax Regs.

In short, the term "qualified appraisal" has the same meaning in section 6664(c)(3)(A), for purposes of avoiding the valuation misstatement penalty, as it has under section 170(f)(11), for purposes of claiming a charitable contribution deduction in the first place. For both purposes, the appraisal must have been received by the donor "before the due date * * * of the return on which a deduction is first claimed * * * with respect to the donated property." Sec. 1.170A-13(c)(3)(iv)(B), Income Tax Regs. Petitioners first claimed a deduction with respect to the easement on their original 2006 return, filed October 15, 2007. The appraisal they obtained from Mr. Dumler before that date was not "qualified." See supra pp. 15-20.

**[*38]** The ameliorative steps petitioners took after October 15, 2007, may show that they acted in good faith. But those steps did not retroactively convert Mr. Dumler's original appraisal into a "qualified appraisal." Because petitioners did not secure a "qualified appraisal" within the meaning of section 170(f)(11)(E)(1), they are precluded by section 6664(c)(3)(A) from relying on the "reasonable cause" defense to the substantial valuation misstatement penalty. We accordingly sustain respondent's imposition of that penalty for 2007 and 2008.[13]

To reflect the foregoing,

Decision will be entered under Rule 155.

---

[13]Since petitioners did not obtain a "qualified appraisal" as required by section 6664(c)(3)(A), we need not decide whether they "made a good faith investigation of the value of the contributed property" as required by section 6664(c)(3)(B). If the Rule 155 computations do not confirm a "substantial understatement" for 2006, petitioners are liable for the substantial valuation misstatement penalty for that year, as well as for 2007 and 2008, for the reasons discussed in the text.