147 T.C. No. 10

UNITED STATES TAX COURT

CAVE BUTTES, L.L.C., MICHAEL WOLFE, TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5788-11.                         Filed September 20, 2016.

A limited liability company (C) sold property to the Maricopa Flood Control District for what it believed was less than fair market value. C obtained an appraisal of the property and took a charitable contribution deduction for the difference between the sale price and the appraised fair market value. R denied the charitable contribution deduction in its entirety, believing that C failed to comply with the substantiation requirements for charitable contributions. R asserted that C failed to attach a qualified appraisal report to its return and that it also failed to use a qualified appraiser. Alternatively, R obtained his own appraisal and determined that the fair market value of the property was not higher than the sale price, thus negating any charitable contributions.

Held: C's appraisal report substantially complied with the requirements of sec. 1.170A-13(c)(5)(iii), Income Tax Regs., by

including one of the two appraisers' signatures on Form 8283, Noncash Charitable Contributions.

Held, further, a description of the appraised property by address and characteristics is sufficient to strictly comply with sec. 1.170A-13(c)(3)(ii)(A), Income Tax Regs.

Held, further, the wording in the appraisal report that it was conducted to value the property for "filing with the IRS" at least substantially, if not strictly, complied with sec. 1.170A-13(c)(3)(ii)(G), Income Tax Regs.

Held, further, a difference between the date of valuation and the date of contribution of at least 11 days and at most 21 days, without any significant events' affecting the land during that time, substantially complies with sec. 1.170A-13(c)(3)(ii)(I), Income Tax Regs.

Held, further, R conceded that the appraisal report's definition of fair market value, while not in strict conformity with the one in sec. 1.170A-1(c)(2), Income Tax Regs., substantially complied with it.

Held, further, a document posted to a government website is self-authenticating if government sponsorship can be verified by visiting the website itself.

Held, further, a 1937 general highway and transportation map digitally converted and posted on a government-sponsored website met all three requirements of Fed. R. Evid. 901(b)(8) as an ancient document exception to the rule against hearsay and was therefore admissible.

Held, further, C had an express easement to access the land when C sold it.

Held, further, C had an implied easement to access the land under Arizona law when P sold it.

Held, further, C's appraisal report reflected a reasonable value of $2.167 million that we adopt.

Michael Allen Harsch, Michael Gregory Galloway, and Kacie N.C. Dillon, for petitioner.

Alicia E. Elliott, Jan Robert Cuatto, and Doreen Marie Susi, for respondent.

HOLMES, Judge:  Cave Buttes, LLC owned 11 acres on a hill that in the distance overlooked downtown Phoenix.  But up close it overlooked a dam owned by the Maricopa County Flood Control District.  The District staff did not want Cave Buttes to build anything close to its dam, but Cave Buttes insisted it had the right and ability to build at least three luxury homes on the property.  After running into a tangle of obstacles thrown up by the District, Cave Buttes decided to sell.  Cave Buttes says the sale was at less than fair market value and wants a charitable-contribution deduction for the difference.  The Commissioner says we shouldn't give Cave Buttes any deduction because it failed to comply with the charitable-contribution regulations and, even if it did comply, the property wasn't worth what it claimed.

FINDINGS OF FACT

Cave Buttes describes the property as an 11-acre, prized piece of "mountainside real estate" valued for its "secluded, premier" location in Phoenix, Arizona. It has "exquisite views" and "endless opportunities" and even undeveloped is worth millions--$2.167 million to be exact. The Commissioner, on the other hand, describes the property as an unremarkable piece of unimproved and inaccessible land.

The contested land is, in fact, on a hillside in the Phoenix metro area and is very close to the U.S. 101 freeway--the major highway used by Phoenicians to get anywhere in their city in a relatively short time. It is also between two residential communities--Mountaingate to the southwest and Happy Valley to the northeast-- but is surrounded on all sides by thousands of acres of open space. Most of this space, however, is owned by the District--the part of local government that protects Maricopa County from floods with a network of dams, spillways, and flow easements that it owns and oversees.

The property entered the early twentieth century as part of a 40-acre piece of the Minneapolis and St. Paul mining patents,[1] and changed hands many times

---

[1] A glorious vestige of the Old West's history, mining claims can be patented or unpatented. An unpatented mining claim is a parcel for which an

(continued...)

between 1908 and 1963, when it was bought by a couple named Robinson. The Robinsons split the property in 1976. They sold the northern 29 acres to the District, and held on to the remaining 11 acres in fee simple. The deed (the 1976 Warranty Deed) to their remaining property carved out a reservation that said: "As a further consideration it is agreed between the parties herein that Grantors shall have access from remaining property in St. Paul Lode Mining Claim to low water mark of the above described property." The "low water mark" is at the base of an old dam, the Cave Creek Dam, within the District-owned portion of the parcel. By 1979 the District had bought much of the property in the area from the United States Department of the Interior's Bureau of Land Management and private landowners as it prepared to build the larger and much more modern Cave Buttes Dam in 1980.

The Robinsons were out-of-towners and rarely if ever visited the property themselves. By the start of this century they were also growing old and in 2003

---

[1](...continued)
individual has asserted a right of possession, but where the right is restricted to the extraction and development of a mineral deposit. The rights granted by a mining claim are valid against a challenge by the United States and other claimants only after the discovery of a valuable mineral deposit. A patented mining claim actually conveys ownership of the land, removes it from the public domain, and lets its owners use and sell it just like the private land easterners are familiar with. See, e.g., Reoforce, Inc. v. United States, 119 Fed. Cl. 1, 5 (2013).

got a postcard from an enterprising Phoenix broker who asked if he could list the property for sale. This broker had developed quite a bit of a business by tracking down longtime landowners with undeveloped land on the fringes of Phoenix. It turned out that the Robinsons were interested, and word soon began to spread that the parcel was going up for sale. It caught the attention of Michael P. Wolfe, a former real-estate agent in Phoenix. Wolfe knew the general location of the property and saw it as the perfect opportunity to build dream homes for his mother, his brother, and himself. So, site unseen, he paid the full--"unbelievable" --asking price of $100,000. The deal closed in February 2004.

Wolfe then met with Larry Hendershot of the District, who cautioned him that the District had become especially sensitive about the safety of its dams after September 11. Hendershot told Wolfe that the District didn't want him to access the property at the point on its northern edge reserved in the old 1976 deed--access that would have required driving on two roads, Cave Creek Dam Road or Jomax Road--because those roads would take him too near the old Cave Creek Dam and its impoundment and spillway areas.[2] The access point reserved in the 1976 Warranty Deed was itself something Hendershot also wanted off limits--it came

---

[2] An impoundment is the body of water created by a dam. A spillway is a structure used to regulate release of flows from a dam into a downstream area.

too close to both the old and the new dams. When Wolfe bought the property, he knew of the access reservation in the 1976 Warranty Deed and didn't believe access would be an issue. And he was content for the time being to get to his property from the south on an existing gravel road. With that, Hendershot handed over a letter granting permission to cross District land and a key to open a gate so Wolfe could now drive to his property.

Wolfe didn't much care which direction he had to drive to get to his property, but if it wasn't to be the point reserved in the deed, he wanted to make sure he could formalize his right to this alternative route. He brought his engineer to a meeting with Hendershot--who surprised him when he showed up with about twenty other District employees. The District staff made clear that they didn't want Wolfe to do anything with the northern easement reservation in the 1976 Warranty Deed. Wolfe tried to discuss the type of road and fence that the District would require if he had to reach his property from the south. He believed he could use existing roads, a small portion of which would have required some work with a road grader and some barbed-wire fencing. But then Hendershot sent Wolfe a letter to explain the District would charge Wolfe about $154,000 to buy access.

A property with obstacles to development is said by those in the industry to have "hair", and Wolfe could see his property's hair growing with every call or

meeting he had with the District. Tired of trying to trim this hair on his own, Wolfe brought in Charles Siddle and Paul Johnson to discuss his predicament. Siddle was a real-estate veteran; Johnson was a former mayor of Phoenix. Almost immediately after hearing a description of the property, Johnson offered to buy it for $1.8 million (contingent, of course, on his being able to obtain the necessary entitlements). He believed, if developed, the property could be worth upwards of $6 million. Wolfe rejected the offer, and suggested instead that Siddle and Johnson become his partners to develop the property as a team. The three formed Cave Buttes, LLC[3] at the end of 2005, with Wolfe owning 50% and Johnson and Siddle splitting the rest.

Later that year, Cave Buttes hired Suthers & Associates to prepare a preliminary plat showing 22 half-acre lots. But because of concerns over the quality of the company's work and its effect on Cave Buttes' development

---

[3] LLC stands for limited liability company. LLCs are creatures of statute and are a form of business ownership that allows one or more people or organizations to invest in an entity that provides them with limited liability. Cave Buttes had the option under the regulations to choose to be taxed as a C corporation, but it had to affirmatively elect to do so. See sec. 301.7701-3, Proced. & Admin. Regs. It did not, and because Cave Buttes had more than one member, tax law treats it as a partnership by default. See id.; see also K.H. Co., LLC Emp. Stock Ownership Plan v. Commissioner, T.C. Memo. 2014-31. (All section references are to the Internal Revenue Code and regulations in effect for the tax year in issue, unless we use a more complete citation.)

timeline, the partners decided instead to do a metes-and-bounds split of the property into three lots. The lots were proportional to the members' ownership interests so that if the partnership ended, each partner could take a lot proportional in size to his membership interest. The metes-and-bounds split created three legally separate properties, and enabled Cave Buttes to form a homeowners association. A homeowners association, they expected, would have an easier time getting a right-of-way from the state, and would also take the property outside the City of Phoenix's subdivision rules. (Subdivisions require more detailed utility services and infrastructure and are generally more costly. A property developed through a metes-and-bounds split does not, for example, need to have a paved road or a water-sewer line.)

Cave Buttes then discovered that the property had been part of an S-1 zoning overlay by the City, which had annexed the property in 2002. Before the annexation, the property was in unincorporated Maricopa County and zoned Rural-43, which allows for one house per acre. The S-1 zoning allows for one dwelling unit for the first acre and one additional unit for each additional 10 acres. This meant that under Rural-43 zoning, Cave Buttes could build as of right 11 houses but under S-1 zoning only 2--though with the metes-and-bounds split, there were now three properties of greater than an acre in size, suggesting there could be

three homes built as of right.[4]  Phoenix, AZ, Zoning Ordinance § 603 (1999).  This possible downzoning of the property was yet more hair sprouting--the partners thought it was not supposed to happen when land is annexed by an Arizona city.[5]  To fix this would mean notifying the city manager and getting the issue heard by the city council.

Johnson became the partnership's designated barber.  Shortly after the formation of Cave Buttes, he began setting up meetings with city and county officials to discuss the property's zoning and access issues.  After these meetings Johnson was confident that Cave Buttes could develop the property into the 22 lots as originally planned.  He also believed, based on his prior experience and dealings with the District, that Cave Buttes would be granted access to the

---

[4]  The District's appraiser, see infra p. 11, apparently thought the size of the property (slightly more than 11 acres) meant that the zoning rules would allow up to 11 homes, if divided into lots of at least one acre.

[5]  It is not at all clear they were right about this.  Arizona law prohibits a city's allowing *greater* uses in its initial zoning of the annexed property.  See Ariz. Rev. Stat. Ann. sec. 9-471(L) (2008).  Here, the land use would have been less.  But Arizona law also says that a later rezoning must be done in accordance with applicable procedures.  Id. sec. 9-462.04(A)(5).  This would require formal notice if a rezoning involves a reduction in allowable uses, which we find it more likely than not the Robinsons never received.  On the other hand, is the initial zoning done as part of the annexation a "rezoning"?  See Blanchard v. Show Low Planning & Zoning Comm'n, 993 P.2d 1078, 1085 (Ariz. Ct. App. 1999) (Noyes, J., dissenting) (suggesting annexing city can do whatever it wants with the initial zoning as long as consistent or more restrictive than before).

property from the south at no cost.  But it became clear that the challenges they were facing with District had less to do with access and more to do with District's concerns about building anything near the dams.  Then another tress sprouted:  It turned out that if Cave Buttes had to access its property from the south instead of its reserved point of access, it would need to negotiate access for a part of the route--about four-tenths of an acre--from the state.  Arizona law has a formal process to do this, and Cave Buttes would have had to fill out an application, obtain an appraisal, and pay an amount that was based on a formula.  The partners believed that getting access is a matter of right in Arizona, not a discretionary grace and favor from the government.  See infra pp. 41-42.  Wolfe estimated this process would take no more than 12 months.  But after pondering all their problems with the District, the partners instead agreed to consider the District's offer for a land exchange.

District policy on land exchanges requires appraisal of both parcels that might be exchanged.  And the District has its own list of appraisers approved for this type of job.  It chose one Wayne Harding.  He appraised the Cave Buttes property for $735,000 as of October 26, 2006, while the trade-property was appraised for around $1 million.  The circumstances of this appraisal are especially important to this case.  The most important one is that, before making

the appraisal, Harding called a local government employee, Diana Cunningham, to ask her a few questions about access to the property--one of several factors that Harding wanted to learn about. Cunningham was a sincere witness and was, at the time Harding spoke with her, a property-management branch manager in the real-estate division of the public works department. She also had twenty years of experience in municipal real-estate issues with the Arizona Department of Transportation. She is a diligent employee and manager, but her training has almost all been on the job--her formal education ended before she graduated from high school. So when Harding asked her about legal access to the Cave Buttes property, she responded sincerely--but without any of the research or expertise in Arizona land law another person might have brought to the question--that in her opinion, the property had no access and the District would not grant access for fear of vandalism, trespassing, and air-quality issues in the dam area. She also told Harding that the County would consider selling a right-of-way over District property for a single residence only--even though she admitted that she didn't know anything about the relevant zoning law, and so didn't know if a single residence was legally the maximum permissible on the property at the time. Based on Cunningham's answers, Harding appraised the property as a legally and physically inaccessible one-home site.

Hypothesizing these kinds of restrictions on their right to develop their property struck the much more knowledgeable and experienced Cave Buttes partners as absurd. But it also made them realize even more than before that their "hairy" property was becoming less clean shaven by the day. Swap discussions broke down soon after. Unable to agree on a selling price for the property, Johnson reached out to the chairman of the Maricopa County Board of Supervisors, Fulton Brock, who suggested to Johnson that Cave Buttes sell the property to the District for the amount of the appraisal and simply donate the remaining value of the property. Siddle then spoke with Deputy County Attorney Jean Rice and various members of the District to say that Cave Buttes was prepared to complete the proposed part-sale/part-donation, but that he had no idea as to the actual value of the property given the mistakes in Harding's appraisal. He proposed that he hire two MAI[6] appraisers to reappraise the property. This worked. Rice called Siddle to say that the District was prepared to accept the deal--$735,000 in cash and a donation of the remaining value. Rice prepared the purchase agreement in April 2007, signed by three representatives of the District

---

[6] Member of the Appraisal Institute. The Appraisal Institute was created by a merger of the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers, and MAI is considered the most highly regarded designation in the real-estate appraisal community. See Schwartz v. Commissioner, T.C. Memo. 2008-117, aff'd, 348 F. App'x 806 (3d Cir. 2009).

and by Wolfe on behalf of Cave Buttes. A letter signed by Wolfe in an addendum to the purchase agreement explains that the $735,000 purchase price is based on the Harding appraisal but the District agrees that the split into three separate lots and the proposed access to the property could result in an increase in the value above $735,000 and that any part of the appraisal value greater than the purchase price would be considered a charitable donation "based on an appraisal that will be requested and paid for by Cave Buttes, LLC, after the close of escrow." The Cave Buttes partners realized that the deal had moved in an unexpected direction. They found a CPA, Larry Workman, to advise them how to properly document and report the donation of the property on their Form 8283, Noncash Charitable Contributions, and Form 1065, U.S. Return of Partnership Income.[7] They then chose to obtain two appraisals, one by Lyons Valuation Group and the other by Edward Conn. Lyons, in a report prepared by David Lyons and his colleague Jeffrey Clifford, appraised the property at $1.5 million and Conn appraised it at $2 million. Cave Buttes decided to use the lower appraisal to report the value of the property on its tax returns.

---

[7] Form 1065 is the annual information return for partnerships. Partnerships report their income, deductions, gains, losses, credits, etc. on this form. The partnership isn't subject to income tax itself, but the partnership items reported on this form flow through to the partners.

The partnership, however, attached both appraisals to its 2007 tax return and made sure to also fill out and attach Form 8283--the form the IRS directs taxpayers to use to describe donated property and identify the charitable donee. Cave Buttes also attached the Lyons appraisal to this form, and made sure it had the signatures of both the appraiser and Andrew Kunasik, Chairman of the District's Board of Directors.

In an FPAA[8] sent in December 2010, the Commissioner determined that Cave Buttes had failed to satisfy the requirements under section 170 for a charitable contribution, that it hadn't adequately established the value of the property to be $1.5 million, and that therefore it wasn't entitled to claim a contribution of more than the District's appraisal of $735,000. Cave Buttes thought this too close a shave and filed a petition with our Court. It also hired a *third* appraiser--Dennis McMillen--to offer his expert opinion on the fair market

---

[8] FPAAs are final partnership administrative adjustments. Certain partnerships are governed by the Tax Equity and Fiscal Responsibility Act (TEFRA). Sec. 6231(a)(1). When the IRS audits a TEFRA partnership return and determines an adjustment is necessary, it sends the partnership an FPAA. The FPAA describes all the proposed changes at the partnership level. TEFRA partnerships designate a partner to act as the tax matters partner to deal with the IRS. Sec. 6231(a)(7); see also Bedrosian v. Commissioner, 143 T.C. 83, 126 (2014) (Vasquez, J., dissenting).

value of the property on the date of donation.  He came up with a fair market value of $2.167 million.

We tried the case in Phoenix where all three Cave Buttes partners resided, and where Cave Buttes had its principal place of business.[9]  The only issues remaining for us to decide are:

- whether Cave Buttes attached a qualified appraisal to its return;

- if it did, whether Cave Buttes is entitled to an even larger charitable-contribution deduction based on the appraisal it introduced at trial; and

- whether Cave Buttes is liable for a gross-valuation misstatement penalty.

OPINION

I. Qualified Appraisal

Section 170 governs charitable deductions, and it states that "[a] charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary."  Sec. 170(a)(1).  The Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 155, 98 Stat. at 691, provides certain rules for substantiating charitable contributions and orders the Secretary to prescribe regulations that require a taxpayer who claims a deduction for the donation of

---

[9] We believe this means an appeal would go to the Ninth Circuit.  Sec. 7482(b)(1)(E).

property worth more than $5,000 to "obtain a qualified appraisal for the property contributed." A "qualified appraisal" includes any "additional information as the Secretary prescribes in such regulations." Id. at 692.[10]

These express delegations of authority to the Secretary to issue regulations create "the hoops that a taxpayer must crawl through to claim a deduction." Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34, at *7. And when it comes to noncash charitable deductions greater than $5,000, the substantiation requirements become particularly extensive. See sec. 1.170A-13(c), Income Tax Regs. That regulation says that "[n]o deduction under section 170 shall be allowed with respect to a charitable contribution * * * unless the substantiation requirements described in paragraph (c)(2) of this section are met." Id. subpara (1)(i). Paragraph (c)(2) provides three specific substantiation requirements, but the only one at issue here is the requirement that the donor "[o]btain a qualified appraisal * * * for [the] property contributed." Id. subpara (2)(A).

---

[10] Congress codified that concept in 2004 by adding paragraph (11) to section 170(f) to require a taxpayer to obtain a qualified appraisal for contributions of property if he has claimed a deduction of more than $5,000 for that property. Sec. 170(f)(11)(C) (as amended by American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 883(a), 118 Stat. at 1631). Paragraph (11)(E) defines the term "qualified appraisal" of a property as "a qualified appraisal under regulations or other guidance prescribed by the Secretary." Sec. 170(f)(11)(E).

A taxpayer who makes a bargain sale to charity is typically entitled to a charitable-contribution deduction equal to the difference between the fair market value of the property and the amount realized from the sale. See Knott v. Commissioner, 67 T.C. 681, 689 (1977); Waller v. Commissioner, 39 T.C. 665, 677 (1963). Like any purported charitable contribution, a sale for less than full consideration results in a deduction under section 170 only if it satisfies the statutory requirements. See Stark v. Commissioner, 86 T.C. 243, 256 (1986).[11] Section 1.170A-13(c)(3)(ii), Income Tax Regs., requires a qualified appraisal to include the following information:

> (A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

> (B) In the case of tangible property, the physical condition of the property;

---

[11] Whether these requirements are satisfied also depends on the donor's intent. See Commissioner v. Duberstein, 363 U.S. 278 (1960). Neither party raised Cave Buttes' intent, and we therefore do not discuss it here. We do note, however, the potential for abuse in cases where a taxpayer who negotiates for the best terms he can obtain in a wholly commercial transaction later tries to claim a deduction for the supposed excess value of the 'contributed' property over the consideration he actually received. Stark, 86 T.C. at 256; S. Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 604 (1980); Grinslade v. Commissioner, 59 T.C. 566, 577 (1973).

(C) The date (or expected date) of contribution to the donee;

(D) The terms of any agreement or understanding entered into * * * by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed * * *;

(E) The name, address, and * * * the identifying number of the qualified appraiser * * *;

(F) The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G) A statement that the appraisal was prepared for income tax purposes;

(H) The date (or dates) on which the property was appraised;

(I) The appraised fair market value * * * of the property on the date (or expected date) of contribution;

(J) The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and

(K) The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

Strict compliance with the requirements is sufficient to win a deduction, but it isn't necessary. In Bond v. Commissioner, 100 T.C. 32, 41 (1993), we held that the requirements of section 1.170A-13, Income Tax Regs., were directory rather

than mandatory, and asked instead if the taxpayers had substantially complied with the requirements. The border between substantial compliance and lack of substantial compliance is a contested and unclear one. In Bond, the taxpayers donated two blimps to charity. They also hired an appraiser who filled out the relevant parts of the appraisal summary in section B of the Form 8283 but left out his qualifications. Id. at 33-34. He later provided a list of them at the beginning of the audit. Id. at 34-35. We decided that wasn't fatal because substantially all of the specified information--minus the appraiser's qualifications--did appear on the Form 8283. Id. at 41-42.

In Hewitt v. Commissioner, 109 T.C. 258, 265 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998), we built on Bond and said that the predominant question in substantial-compliance cases was whether "the taxpayers had provided most of the information required, and the single defect in furnishing everything required was not significant." Indeed the legislative history of DEFRA section 155 shows that Congress required a qualified appraisal only to give the Commissioner sufficient information to "deal more effectively with the prevalent use of overvaluations." Id. (citing S. Prt. 98-169 (Vol. I), at 444-45 (S. Comm. Print 1984), and Staff of Joint Comm. on Taxation, General Explanation of

the Revenue Provisions of the Deficit Reduction Act of 1984, at 505-08 (J. Comm. Print 1985)).

We have always hesitated in substantial-compliance cases to push too hard against the regulatory language--it's not the job of a court to rewrite regulations, especially when Congress so clearly states its intent for an area of tax law to be governed by them. This has meant that taxpayers have had great difficulty in meeting the substantial-compliance standard because we've held that compliance isn't substantial if an appraisal fails to meet the "essential requirements of the governing statute." Estate of Clause v. Commissioner, 122 T.C. 115, 122 (2004). We compiled a list of common errors in Mohamed v. Commissioner, T.C. Memo. 2012-152, 2012 WL 1937555, at *7:

- failing to get an appraisal, see, e.g., Todd v. Commissioner, 118 T.C. 334, 336, 347 (2002);

- failing to fill out section B of Form 8283 (the appraisal summary), see, e.g., Hewitt, 109 T.C. at 260, 264;

- having someone without expertise in appraisals complete the appraisal, see, e.g., D'Arcangelo v. Commissioner, T.C. Memo. 1994-572, 1994 WL 652230, at *9;

- having an appraisal prepared after the return was filed, see, e.g., Jorgenson v. Commissioner, T.C. Memo. 2000-38, 2000 WL 134332, at *8; and

- including insufficient or inappropriate information in an appraisal, see Smith v. Commissioner, T.C. Memo. 2007-368, 2007 WL 4410771, at *19-20, aff'd, 364 F. App'x 317 (9th Cir. 2009).

We held in Estate of Evenchik, for example, that an appraisal of the incorrect asset prevents the Commissioner from properly understanding and monitoring the claimed contribution, see Evenchik, at *8, and thus failed the substantial-compliance test. There were also lots of other failures to strictly comply with the regulation in that case. But we explained that our focus in substantial-compliance cases was on whether the appraisals described the contributed property well enough to permit the Commissioner to understand the appraiser's valuation methodology. Id. at *12-*14.

The Commissioner's first attack on Cave Buttes, then, is that the partnership did not comply--either strictly or substantially--with the regulation's requirement that it attach a "qualified appraisal" to its return.[12] Cave Buttes tells us to look at

---

[12] The Commissioner's first argument is that Cave Buttes didn't follow the regulation, but he also argued in his answering brief that Cave Buttes' transfer of the property to the District was not "exclusively for public purposes." See sec. 170(c)(1). A party may generally not raise a new issue if it surprises or prejudices the opposing party. See Seligman v. Commissioner, 84 T.C. 191, 198-99 (1985), aff'd, 796 F.2d 116 (5th Cir. 1986); Robertson v. Commissioner, 55 T.C. 862, 865 (1971); Philbrick v. Commissioner, 27 T.C. 346, 353 (1956). We need not delve much deeper on this, however, because we find that donations to a county's flood-control organization for the preservation and safety of the surrounding dam area are for the use of a political subdivision of a state and exclusively for public

(continued...)

the Lyons appraisal, one of the two it attached to its return, but the only one that

Cave Buttes attached to its Form 8283. The Commissioner says he already has,

and asks us to hold it up against the list of requirements in the regulation. He sees

five flaws:

- It was not prepared by a qualified appraiser and does not include the qualification of the appraiser who prepared the report;

- it does not include a sufficiently detailed or accurate description of the property;

- it does not include a statement that the appraisal was prepared for income-tax purposes;

- the date of value is not the date of the purported contribution; and

- its definition of fair market value is not the same definition as in section 1.170A-1(c)(2), Income Tax Regs.

We address each in turn.

A.    Qualified Appraiser

Section 1.170A-13(c)(5)(i), Income Tax Regs., defines a "qualified

appraiser" as an individual * * * who includes on the appraisal summary * * *, a

declaration that--

---

[12](...continued)
purposes. See Patel v. Commissioner, 138 T.C. 395, 401 (2012) (contributions or gifts to nonprofit volunteer fire companies are deemed to be for the use of a political subdivision of a state for exclusively public purposes and are deductible under section 170(c)(1)).

(A) [t]he individual either holds himself or herself out to the public as an appraiser or performs appraisals on a regular basis;

(B) [b]ecause of the appraiser's qualifications as described in the (pursuant to (c)(3)(ii)(F) of this section), the appraiser is qualified to make appraisals of the type of property being valued;

(C) [t]he appraiser is not one of the persons described in paragraph (c)(5)(iv) of this section; and

(D) [t]he appraiser understands that an intentionally false or fraudulent overstatement of the value of the property described in the qualified appraisal or appraisal summary may subject the appraiser to a civil penalty under section 6701 for aiding and abetting an understatement of tax liability, and, moreover, the appraiser may have appraisals disregarded pursuant to 31 U.S.C. § 330(c) (see paragraph (c)(3)(iii) of this section).

There is another complication. The Lyons appraisal was written by two appraisers, David Lyons and Jeffrey Clifford, and the regulation says that if two appraisers contribute to a single appraisal, each shall comply with these requirements. Id. subdiv. (iii). The Commissioner argues that neither Lyons nor Clifford was a qualified appraiser. He argues that Lyons lacked personal knowledge about both the property and the comparables used in the report, and that he didn't personally prepare the report--Clifford did. But Clifford is not a qualified appraiser either because he did not sign the declaration on Form 8283, and the appraisal does not include his qualifications.

We start with the missing signature and resume. Both Lyons and Clifford signed the appraisal report itself, even though only Lyons signed the Form 8283. We'd hesitate to say this wasn't good enough. The regulation states that when more than one appraiser is used, all of them must sign the appraisal report. Id. The regulation also says that an appraisal summary is to be filled out and "made on the form prescribed by the Internal Revenue Service." Id. subpara. (4)(i)(A). This form is Form 8283, so the requirement that both appraisers sign the form was contained within the dense regulation. But at the time Cave Buttes filed its 2007 return, the instructions for the form didn't address who must sign the form when multiple appraisers contribute to a single appraisal. The instructions changed in 2012 to specifically say that if more than one appraiser was used, both are required to sign the appraisal *and* Part III of Form 8283, but the Form to this day includes only one signature line. Although we recognize that instructions to forms are not binding sources of law, they are useful in illustrating understandable taxpayer confusion. Why else would the IRS have changed the instructions to be more clear? We find that the failure to sign Form 8283 by one of two appraisers, especially when they both signed the attached appraisal report, substantially complies with the requirements of the regulation. See Bond, 100 T.C. at 42.

Lyons' resume was attached to the appraisal, but Clifford's was not. (Clifford also wasn't available to testify at trial, but we note that this issue was first raised by the Commissioner on brief.) So we have to agree with the Commissioner that Cave Buttes did not strictly comply with the requirements in the regulation when it omitted Clifford's qualifications from the appraisal. But did it substantially comply? We find that it did. This is just like Bond, where we applied the substantial-compliance doctrine when the taxpayer included all of the information required by a regulation except the qualifications of the appraiser. Id. Here, all of the requirements for a qualified appraiser have been met: Lyons' qualifications were included with the appraisal, and the Commissioner never previously questioned until posttrial briefing whether Clifford was a qualified appraiser.

B.    Accurate Description of the Property

The regulation also requires that the property be described in sufficient detail for a person who is not generally familiar with the property to ascertain that the property that was appraised is the property that was or will be contributed. Sec. 1.170A-13(c)(3)(ii)(A), Income Tax Regs. The Commissioner next argues that the Lyons appraisal violated this requirement when it described the property as three separate lots. Cave Buttes argues that the parties stipulated that the

property was three lots when it was transferred to the District in April 2007, and that the parties completed the transfer with three separate deeds. Gotcha! says the Commissioner: The property may have been transferred in April 2007, and the appraisal may have been done in May 2007, but the property was effectively split into three lots only on August 14, 2007--under Arizona law, the Commissioner argues, a property split is deemed effective only when the county assessor completes his identification and valuation of the resulting parcels. Ariz. Rev. Stat. Ann. sec. 42-15105 (2006 & Supp. 2015); see Premiere RV & Mini Storage, LLC v. Maricopa Cty., 222 Ariz. 440, 444 (Ct. App. 2009). That's true for property-tax valuation, but the parcel's three-way division here was legally recorded February 16, 2007, and there is no evidence that the District thought that the division was invalid or that the effective date of the split for property-tax purposes otherwise affected the property's value.

The Commissioner also contends that the Lyons Appraisal was based on erroneous information about access to utilities that Wolfe and Siddle provided to the appraisers: He says that the Lyons appraisal stated there was electricity a quarter mile away from the property, when it reality it was three-quarters of a mile away. Cave Buttes counters by arguing that its appraiser valued the property as raw land, with a downward adjustment for the lack of utilities to the property.

The Commissioner next says that the Lyons appraisal wrongly assumed the property had access. We disagree. The Lyons appraisal states: "[A]ccess to the land is currently by an un-named gravel road in the Cave Buttes Recreation Area. The entrance to the property is gated. The former owner, Mr. Siddle, informed us that when he owned the land he had a key to unlock the gate in order to access the property. The entrance for the property [is] on the south side of the recreation area on Cave Creek Dam Road." We do not find this information to be inaccurate. Hendershot had indeed provided a letter granting permission and key to open the gate on the south end of the property to Wolfe.

We also think that these arguments about utilities and access miss the point of the regulation's requirement that an appraisal describe the property. The Lyons appraisal describes the property as a "hillside lot with mountain and city views." It provides an address, maps, and aerial photographs that identify the property. It says the property is "located at the southwest corner of Jomax Road and Cave Creek Dam Road in north Phoenix" and cites specific measurements of the lots. Since the purpose of this requirement is to let the IRS know what's being donated, a description by address and characteristics is enough to strictly comply with the regulation. (Though of course the Commissioner's criticisms may yet affect our findings on the worth of Cave Buttes' proof of the property's value.)

C.      Prepared for Income Tax Purposes

The Commissioner argues that the Lyons Report does not contain a statement that the appraisal was prepared for income-tax purposes.  The report, however, states:  "The purpose of this appraisal is to estimate the current Market Value of the fee simple interest in the subject property as of the date of valuation for filing with the IRS."  (Emphasis added.)  We refuse to find that there are magic words required to fulfill this requirement, and "for filing with the IRS" is sufficient to substantially comply, if not strictly comply, with the requirement that the appraisal state it was prepared for income-tax purposes.

D.      Date of Value Is Not the Date of Contribution

Under Arizona law, legal title transfers on the date the deed is signed by the seller, unconditionally delivered to the purchaser, and accepted by the purchaser.  Ariz. Rev. Stat. Ann. secs. 33-401(A) and (B) (2014).  Wolfe signed and delivered the deeds and the purchase agreement to the District on April 18, 2007.  Some other documents were required for closing, and those were separately delivered on April 24, 2007.  The Commissioner argues that on these facts, legal title transferred no later than April 24, 2007.  But the Lyons appraisal states on its cover page that the date of the valuation was May 15, 2007, and states inside that May 5, 2007 was the "Date of Valuation."  Cave Buttes points to Dunlap v.

Commissioner, T.C. Memo. 2012-126, 2012 WL 1524660. There, the appraisal provided a valuation date one day before the easement was donated. We found that although there wasn't strict compliance with the requirements of the regulations, this violation was a minor one and "standing alone is not substantial." Id., 2012 WL 1524660, at *34. Here, the date of valuation is off by at least 11 days and at most 21 days. This was a deal with a number of moving parts and a somewhat vague closing date. Without any significant event that would obviously affect the value of the property in those two or three weeks, we agree with Cave Buttes that it substantially complied with the regulation.

E.    Definition of Fair Market Value[13]

For federal income-tax purposes, fair market value is the appropriate standard for valuation. It means "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. The Lyons appraisal uses the definition of market value established under the Financial Institutions Reform,

---

[13] We note again that this is a new issue that the Commissioner raised for the first time on brief.

Recovery, and Enforcement Act of 1989, 12 C.F.R. sec. 34.42 (1994). That part

provides that "market value" is:

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> 1. Buyer and seller are typically motivated;
>
> 2. Both parties are well informed or well advised and are acting in what they consider their best interest;
>
> 3. A reasonable time is allowed for exposure in the open market;
>
> 4. Payment is made in cash in United States dollars or terms of financial arrangements comparable thereto; and
>
> 5. The price represents normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[14]

Each component of the regulation's definition of fair market value is present in the

definition used in the Lyons appraisal (and, for that matter, the Commissioner's

own expert-witness report, which used the same definition as the Lyons

---

[14] This is the same definition the Commissioner's appraiser used in his appraisal.

Appraisal's). There's a "fair sale" with buyer and seller acting "prudently and knowledgeably" and unaffected by "undue stimulus."

The Commissioner argues only that Cave Buttes did not strictly comply with the requirements in the regulation. We'll treat that as a concession on the issue of substantial compliance with this part of the regulation. To sum up, we find that Cave Buttes complied either strictly or substantially with each of the requirements for a qualified appraisal report.

## II. The Property's Fair Market Value

Because we find that Cave Buttes complied--either strictly or substantially-- with the qualified-appraisal regulation, we can move onto the next contested issue: the fair market value of the property. If Cave Buttes is right, that value is greater than what it claimed on its return; if the Commissioner is right, that value is less.

### A. General Considerations

We begin with the general rules. Under section 170, the amount of a charitable-contribution deduction is equal to the property's fair market value, less the value of any goods or services received in return. Sec. 1.170A-1(h)(2), Income Tax Regs. The taxpayer has the burden of proving that the valuation of donated property should have been higher than that stated in the notice of deficiency. Anselmo v. Commissioner, 80 T.C. 872, 886 (1983), aff'd, 757 F.2d 1208, 1211

(11th Cir. 1985); <u>Evans v. Commissioner</u>, T.C. Memo. 2010-207. The regulations define fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; <u>see also</u> <u>United States v. Miller</u>, 317 U.S. 369, 374 (1943). We look at hypothetical willing buyers and sellers, and do not construct "particular possible purchasers." <u>Estate of Simplot v. Commissioner</u>, 249 F.3d 1191, 1195 (9th Cir. 2001), <u>rev'g and remanding</u> 112 T.C. 130 (1999); <u>see also</u> <u>Morrissey v. Commissioner</u>, 243 F.3d 1145, 1148 (9th Cir. 2001), <u>rev'g</u> <u>Kaufman v. Commissioner</u>, T.C. Memo. 1999-119.

Fair market value is a question of fact to be determined from all relevant evidence on the record. <u>Jarre v. Commissioner</u>, 64 T.C. 183, 188 (1975); <u>Kaplan v. Commissioner</u>, 43 T.C. 663, 665 (1965). In determining fair market value, we look to the "highest-and-best use" for the property in question. <u>See</u> <u>McMurray v. Commissioner</u>, 985 F.2d 36, 40 (1st Cir. 1993), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1992-27; <u>Browning v. Commissioner</u>, 109 T.C. 303, 323 (1997); <u>Van Zelst v. Commissioner</u>, T.C. Memo. 1995-396, <u>aff'd</u>, 100 F.3d 1259 (7th Cir. 1996); <u>McLennan v. United States</u>, 24 Cl. Ct. 102, 108 (1991), <u>aff'd</u>, 994 F.2d 839 (Fed. Cir. 1993). Highest and best use is the "reasonably probable and legal use of

vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." Appraisal Inst., Appraising Residential Properties 255 (2d ed. 1994). One item to consider is whether there are any potential uses that, while prohibited on the valuation date, have a strong possibility of being achieved. See, e.g., Crimi v. Commissioner, T.C. Memo. 2013-51 ("Subsequent events are generally not considered in determining fair market value * * * though they may be considered to the extent reasonably foreseeable on the valuation date." (Citation omitted.)).

There are several accepted methods of estimating fair market value for any property, including comparable sales, income (or discounted cashflow), and replacement cost. See Terrene Invs., Ltd. v. Commissioner, T.C. Memo. 2007-218. The comparable-sales approach uses market data and looks for sales of property in the same market with similar characteristics that were made at arm's length. See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987); Rev. Proc. 79-24, 1979-1 C.B. 565. Both sides here use the comparable-sales approach. Both parties also agree that the highest and best use of the Cave Buttes property was for residential development. The experts do disagree whether this highest and best use was financially feasible.

B.    Legal Access

The most contested issue in this case--and the most important in finding what was financially feasible for the property--is whether the property had access, and if not, what the cost and probability of obtaining access would be.  While the parties dispute whether there was physical access, we find that there undoubtedly was.  Hendershot's letter to Wolfe granting him temporary access from a gate to the south via a well-maintained gravel road already in existence proves there was physical access to the property.  Whether there was legal access is the real issue.  The Commissioner's appraiser, Loper, says there wasn't and that the owner would have to buy a right-of-way.  Cave Buttes argues it had (or could obtain) legal access in five different ways:

- It had access pursuant to the 1976 deed reservation;

- it had access pursuant to the Minneapolis and St. Paul mining patents;

- it had access pursuant to an implied easement;

- it could obtain access by submitting an application and purchasing a right-of-way from the FCD and Arizona; and

- it could file a claim under Ariz. Rev. Stat. Ann. sec. 12-1202 for a private right of way of necessity.

It also argues that gaining recognition of this legal access wouldn't have been terribly expensive.

We begin with some vocabulary from first-year property law:  An easement is a right that one person has in the estate of another.  Laurence v. Kruckmeyer, 605 P.2d. 466 (Ariz. Ct. App. 1979); see also Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land, sec. 1:1 (2016).  The property subject to the easement is the servient tenement; the property benefited by the easement is the dominant tenement.  Arizona recognizes several different types of easements.

### 1.     Access by Express Easement

Cave Buttes first argues that it had an express easement by virtue of the 1976 Warrant Deed reservation.  Express easements must be expressly conveyed. McFarland v. Kempthorne, 545 F.3d 1106, 1112 (9th Cir. 2008); Fitzgerald Living Tr. v. United States, 460 F.3d 1259 (9th Cir. 2006).  In Fitzgerald and McFarland, the Ninth Circuit rejected express easements where the respective patents conveyed the property "with the appurtenances thereof."  McFarland, 545 F.3d at 1111.  The court in Fitzgerald explained that the word "appurtenances" implies there is an existing easement but does not create one.  Fitzgerald Living Tr., 460 F.3d at 1267 (citing United States v. Jenks, 129 F.3d 1348, 1355 (10th Cir. 1997)). The issue then hinged on whether an easement existed at the time of the grant. And in both cases, the court found it did not.  The taxpayer in McFarland

undermined his own argument through his representations that his predecessor's access into the property was not protected by any easement or other guaranty of continued access. But in Fitzgerald the court cited a standard treatise on easements for the proposition that "[t]he intent to grant an easement must be so manifest on the face of the instrument . . . that no other construction can be placed on it." Fitzgerald Living Tr., 460 F.3d at 1267 (quoting 25 Am. Jur. 2d Easements And Licenses In Real Property § 15 (2004)).

The 1976 Warranty Deed states "Grantors *shall have access* from remaining property in St. Paul Lode Mining Claim to low water mark of above described property." (Emphasis added.) The parties agree that the "low water mark" was located at the northern section of the 40-acre parcel near the base of the Cave Creek Dam. But they disagree about whether a road through the 29-acre parcel transferred to the District existed at the time that would have given access to the Robinsons to the remaining part of their land. This is an important difference--if there used to be a road right to the subject property over the District's land, then the deed's language "shall have access" would lead us to find that Cave Buttes did indeed have an express easement over the District's land.

But was there such a road? Cave Buttes offered old maps as proof that the Cave Creek Dam Road used to be a state highway that was regularly used to

access the property when it was part of the larger 40-acre parcel. The admissibility of this evidence is pivotal in determining whether "access" existed at the time of the 1976 deed and thus at the time Cave Buttes donated and sold its property.

These old maps are hearsay, of course, and we'd normally have to exclude them. But Cave Buttes argues they are within the little-used ancient-document exception to the rule. A properly authenticated ancient document (one in existence 20 years or more) must meet three requirements to avoid exclusion: The document must be (1) more than 20 years old; (2) regular on its face with no signs of obvious alterations; and (3) found in a place of natural custody, or in a place where it would be expected to be found. If these requirements are met, then the document is *prima facie* authenticated and therefore admissible. Fed. R. Evid. 901(b)(8). Rule 901(b) of the Federal Rules of Evidence, example 8, extends the rule to electronically stored data, and stresses the importance of custody or place where it is found. Here, the maps are from 1937 and were converted into a digital format accessible online. Cave Buttes obtained the maps from the Arizona State Library, a state-maintained website. The maps declare they are part of the Arizona

Memory Project:[15] "A service of Arizona State Library, Archives and Public Records, a division of the Secretary of State." Cave Buttes argues that the maps are at least 20 years old, in a condition that create no suspicion about authenticity, and were obtained from a place where if authentic they would likely be (i.e., a library). The Commissioner responds that what Cave Buttes wants into evidence isn't the actual old and crinkly map, but a 21st-century digitized image of an old and crinkly map. That *image,* and certainly not the downloaded printout of that image*,* is not 20-years old and so there's nothing ancient about it. Without some credible live testimony about the conversion process (which Cave Buttes did not present), he argues, the maps are inadmissible as ancient documents.

This may seem like a newfangled issue, but it's not. The Commissioner cites Martinez v. American's Wholesale Lender, 446 F. App'x 940, 944 (9th Cir. 2011) for the proposition that private websites are not self-authenticating. But the website here belongs to the Arizona State Library. Rule 902(5) of the Federal Rules of Evidence provides that "[a] book, pamphlet, or other publication purporting to be issued by a public authority" is self-authenticating. See Hansen

---

[15] This is an initiative made possible in part by a grant from the United States Institute of Museum and Library Services to help Arizona cultural institutions make their digital holdings available online. The goal is to create a repository of government documents, photographs, maps, and objects that "chronicle Arizona's past and present." http://azmemory.azlibrary.gov/cdm/about.

v. PT Bank Negara Indonesia (Persero), 706 F.3d 1244, 1250 (10th Cir. 2013). And the Seventh Circuit has explained that "[a] document posted on a government website is presumptively authentic if government sponsorship can be verified by visiting the website itself". Qiu Yun Chen v. Holder, 715 F.3d 207, 212 (7th Cir. 2013). We choose to follow the Seventh Circuit and hold that a document posted to a government website is self-authenticating if government sponsorship of the site can be verified by visiting the website itself. Here, we find it can be. The website is a .gov website and declares it is a "division of the Secretary of State." The title of the page is "Historic Arizona County Road Maps" and above the map portion of the document, the caption states "Maricopa County Arizona: General Highway and Transportation Map. 1937. . . Prepared by the Arizona State Highway Department in cooperation with the U.S. Department of Agriculture, Bureau of Public Roads. Data obtained from state-wide highway planning survey." *Historic Arizona County Road Maps*, ARIZONA MEMORY PROJECT (2015), http://azmemory.azlibrary.gov/cdm/search/collection/har/page/4. We are satisfied that the information contained in the document is sufficient to meet all three requirements of the ancient-document rule, and the downloaded image meets the standard of the self-authentication rule of rule 902(5) of the Federal Rules of Evidence as being from a website issued by a public authority.

With the introduction of the old maps we find that Cave Creek Dam Road existed at the time the Robinsons transferred the northern portion of the land to the District. See Jenks, 129 F.3d at 1355. We are persuaded that Cave Buttes' predecessors in title received express-access easements over the Cave Creek Dam Road. And we thus find that an express easement existed at the time Cave Buttes sold its remaining 11-acre portion to the District.

2. Access by Implied Easement

Because access is so important to the ultimate question of the property's value, Cave Buttes also argued that it had an implied easement. Arizona recognizes this concept. Porter v. Griffith, 543 P.2d 138 (Ariz. Ct. App. 1975). An implied easement can be made only in connection with a conveyance, as an implied easement is based on the theory that whenever a grantor conveys property, he includes or intends to include whatever is necessary for its beneficial use and enjoyment. Id. at 140. Arizona law has four requirements:

- The existence of a single tract of land so arranged that one portion derives a benefit from the other;

- that was divided by a single owner into two or more parcels via a separation of title;

- before the separation, the use of the newly servient parcel was long, continued, obvious, and manifest, to a degree which shows permanency; and

- the use of the claimed easement must be essential to the beneficial enjoyment of the parcel to be benefited.

Id. Here, all four elements are met. The property used to be part of a 40-acre mining patent. The Robinsons sold the northern section of the parcel to the District in 1976. The Robinsons reserved access to the property in the 1976 Warranty Deed. And access to the property is necessary for its enjoyment and use. We therefore find in the alternative that Cave Buttes had an implied easement of access.

### 3. Access by Right-of-Way

As a last resort, if we assume that there was neither an express nor an implied easement, Cave Buttes argues that it still had the option to buy access to the property by going through a formal application process with the District. This involves paying a $250 application fee, filing an application, and obtaining stamped engineering plans. Hendershot estimated that a right-of-way would cost Cave Buttes around $154,000. This includes inspection and appraisal fees. This is the same process that the District used in 2011 when it obtained a right-of-way from the state of Arizona--it paid $60,000 plus fees for a right-of-way that was less than one-half mile. We do not find that a process that was available to the District is unavailable to Cave Buttes: Under Arizona law, reasonable access to

private property cannot be denied by the state or any political subdivision of the state. Ariz. Rev. Stat. Ann. sec. 33-2401 (2014).

We do not need to solve this problem here, but we do need to reach a conclusion on the strength of Cave Buttes' claim of legal access and its effect on the value of the property. The greater the uncertainty, the greater the decrease in the value of the property. Based on the foregoing, we find that Cave Buttes had an exceptionally strong claim that it had legal access at the time of the transfer.

C.    Other Problems of Comparability

There are some other issues that the parties argue affect the property's fair market value.

Zoning. Cave Buttes argues that the property was improperly downzoned and the ease of rezoning the property should have been considered in the highest-and-best-use-analysis. The Commissioner argues that this argument is irrelevant to the question of value. At the time of the transfer, the property was zoned S-1, which provides for one dwelling unit for the first acre and one additional dwelling unit for each additional 10 acres. This zoning designation would allow for at most two dwellings on the property, or three after the metes-and-bounds split. On the other hand, if the property were rezoned as Rural-43, this would provide for several more than three dwellings on the property. We don't think we need to

decide this question: Both Cave Buttes' and the Commissioner's appraisers valued the property based on the potential development of three high-end residential properties. Even if Cave Buttes is correct that the ease of rezoning should have been considered, it did not submit an appraisal that reflected this adjustment, meaning any adjustments it thinks should be made to the value now are completely unsubstantiated.

Missing Steps. The Commissioner argues that the value of the property should not reflect steps that Cave Buttes decided not to pursue in the development of the property. Cave Buttes treats this as an argument that it had to actually put the property to its highest and best use. We think both parties are trying to make the other's argument a straw man. In Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986), we held that the fair market value of the property turned on the "realistic, objective potential uses." To determine what uses are reasonable and probable, we focus on "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future". Olson v. United States, 292 U.S. 246, 255 (1934); see also Hay v. Commissioner, T.C. Memo. 1992-409.[16] The steps that it could reasonably and

_____

[16] Although the highest and best use of property may be the *ceiling* on how much a willing buyer would pay for the property, it is not necessarily the *floor* on

(continued...)

probably taken within a reasonable proximity to the valuation date must be factored into the valuation. Hay, T.C. Memo. 1992-409. What an appraiser must do, after identifying a parcel's highest and best use, is find comparables with a similar highest and best use at the same stage of development (e.g. raw land) or make reasonable adjustments to comparables at different stages of development. See Crimi v. Commissioner, T.C. Memo. 2013-51; see also SWF Real Estate LLC v. Commissioner, T.C. Memo. 2015-63.

Cost of obtaining access. The most important of these for this case is, of course, the problem of access. We have found that Cave Buttes had legal and physical access to its property. But it also faced at least the possibility of a fight about getting its right vindicated. That fight could be costly. We therefore find that a reasonable buyer and seller would take into account that legal and physical access existed, but there would likely be costs in working out the formal details of a particular access route. We do not think it makes a difference whether this is reflected in a subtraction from the final fair market value determination or another

---

[16](...continued)
how little a willing seller would accept. The hypothetical willing buyer and the hypothetical willing seller will not invariably conclude their negotiation over price at a price reflecting the value of the property at its highest and best use. See Van Zelst v. Commissioner, 100 F.3d 1259, 1262-63 (7th Cir. 1996), aff'g T.C. Memo. 1995-396; Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. 304, 331-33 (2012), aff'd in part and vacated in part, 755 F.3d 236 (5th Cir. 2014).

adjustment to be made to the comparable properties in determining the initial fair market value.

D.     Comparing the Comparables

This brings us to the main event of this part of the case--the fight between Cave Buttes' appraiser and the Commissioner's. We summarize each report, focus on their differences, and explain which we find persuasive.

The McMillen Report. McMillen, Cave Buttes's appraiser at trial, began by establishing a highest and best use of three homes. This corresponds to the three parcels that Cave Buttes had created and recorded. We agree that this use is in accord with the zoning in effect at that time. McMillen's key preliminary conclusion is that Cave Buttes had a very strong claim to legal access. As explained at length above, we agree with this conclusion.

McMillen then looked for comparable sales of property in the same state of development; i.e., raw land. He found seven, five of which were in the same neighborhood as the Cave Buttes property.[17] He then looked to nine factors that, he reasoned, might differ between his comparables and the Cave Buttes property:

---

[17] The only two that were not in the same neighborhood were sales 2 and 3, but these were still located one neighborhood away, were still in Phoenix, and had the same highest and best use.

- property rights conveyed,

- financing terms of the sale,

- conditions of the sale,

- time of sale,

- location,

- views,

- access (which includes access for utility extensions),

- hillside location, and

- size.

The first three made little difference. Each of McMillen's comparables was held in fee simple, was sold for cash, and was part of a sale between unrelated parties. The Cave Buttes property was also held in fee simple, and part of computing its fair market value is to determine a reasonable cash price between unrelated parties.

The remaining factors were a bit more complicated.

Time of sale. An ideal appraisal would have comparable sales made on the same date as the date of appraisal. This is, in the real world, usually impossible. And McMillen's comparables include two from 2005 and two from 2006, which are some distance in time from April 2007. But as even the Commissioner's

expert recognized, land prices in the area of Cave Buttes' property were in general increasing from 2005 through the end of 2006. They leveled off at the time of valuation in this case before going on their long swoon to and through the Crash of 2008. McMillen did not adjust the prices of his comparables from the earlier years, and made reasonable adjustments for his two remaining comparables from late 2007 when prices had already begun going down.

Location. In looking for comparables, McMillen found four that were fairly near the Cave Buttes property. Two were farther away from downtown Phoenix, and one was in a more industrial (and thus less desirable) location. He made upward adjustments for these of between 5 and 10 percent.[18] We find this reasonable.

Views. McMillen credibly reported that market data showed sites with good views were more valuable than sites without. His comparables 1 and 2 were level lots so he made a 13% adjustment for lack of hillside views. His other

---

[18] An upward adjustment reflects positive qualities in the appraised property that are lacking in the comparable property. A downward adjustment reflects negative qualities in the appraised property that are present in the comparable property. An appraiser might make an upward adjustment, for example, by increasing a comparable's per-acre price by 10 percent if the subject property had a better view or grade or size. He might make a downward adjustment, for example, if the appraised property had inferior access.

comparables had some view, but not the exceptional views of the Cave Buttes property. We find these adjustments reasonable.

Access. Here McMillen made two important conclusions. The most important was that the Cave Buttes property had legal access. We agree with this conclusion for the reasons we've already discussed. But McMillen also recognized that the access was contested and certainly more difficult than access to raw land with a road already nearby. He therefore made substantial downward adjustments (20-30%) to the prices of the comparables to reflect their better access and the effect of that superior access on the cost of, for example, extending utility access to the Cave Buttes site. We find these adjustments reasonable.

Hillside. While a lot with a better view commands a better price, a hillside location itself brings higher costs of development--for example, the probability of higher costs of grading and delivering materials to the site. This is foreseeable and reflected in raw land prices. We therefore agree with McMillen that this merited an adjustment in the two comparables on level ground.

Size. Both experts agreed that smaller lots generally sell for a higher per-acre price than larger lots, all things being equal. Two of McMillen's comparables were notably smaller than the Cave Buttes property, and his downward adjustments to their prices was also reasonable.

McMillen valued the property as three separate lots computing a per-acre price and then applying it to each of the lots, summing their total. Ultimately, McMillen determined the market value of the property to be $4.25 per square foot, for a total of $2,167,500.

The Loper Report. John Loper, the Commissioner's expert, also appraised the property. He based his appraisal on the assumption that the Cave Buttes property was without any legal access at all. This immediately caused problems for his analysis, since there were apparently no raw land sales with no access for him to compare the Cave Buttes property to. He used a sort of comparable-sales approach anyway. He found six sales of land, dispersed over a wider area than McMillen's comparables. But he concluded that they were not actually comparable because none were similarly landlocked.

Though he agreed that the partnership could legally build three homes under existing zoning laws, these assumptions led Loper to conclude that the highest and best use of the property was to just hold the property for future residential development because no development was feasible on the valuation date.

And yet even with these unreasonable inputs, his report and testimony reaches some useful conclusions. He testified that the lots could be sold separately and acknowledged that the metes-and-bounds split was a legal division,

but then considered the property as a whole instead of as three separate and smaller lots, and made a downward adjustment accordingly. Four of his comparables were farther from freeways and not even in Phoenix, but he made no adjustment to their reported sale price to reflect that. And in the end he applied a whopping 60 percent discount for Cave Buttes' lack of access to its property, bringing his value down to $505,800. The power of these unreasonable assumptions was revealed in one of Cave Buttes' exhibits--it showed that had Loper assumed the property had access, honored the metes-and-bounds split, viewed the property as three separate lots, and made an adjustment for its superior view, his own method would have produced a value of between $1.8 million and $2.3 million.

Conclusion. We find McMillen's appraisal entirely reasonable. We agree that the comparable sales should have been adjusted upward to reflect the views from the Cave Buttes property. We agree that the Cave Buttes property should have been valued as three separate lots to reflect the metes-and-bounds split, rather than as one 11-acre parcel. And we agree that the appraisal should have assumed there was legal access to the property, and then made a downward adjustment to reflect the cost of obtaining that access. The McMillen report valued the property at $2.167 million.

We find this figure reasonable and adopt it as our finding.

E.      Bargain Sale Charitable Contributions

The Commissioner makes one final point--even if one finds for Cave Buttes on most of the little contested points, would one be missing the forest for the trees--or perhaps its Sonoran equivalent of missing the boulder for the gravel?  He argues that this is exactly the type of transaction that Congress intended to prevent with strict substantiation requirements.  He frames this case as a situation where a partnership has orchestrated a voluntary, open-market sale transaction to appear as if it was a bargain sale to enable its partners to entirely offset their significant capital gain with a charitable-contribution deduction.

Cave Buttes, however, argues that it isn't blasting a new loophole in the Code.  It found at least a couple similar precedents:  Herman v. United States, 73 F. Supp. 2d 912 (E.D. Tenn. 1999) and Consolidated Investors Group v. Commissioner, T.C. Memo. 2009-290.  In Herman, the taxpayers bought significantly discounted hospital equipment from a bankrupt hospital.  They had the equipment appraised, and then donated the equipment to a new hospital and claimed a charitable-contribution deduction.  Herman, 73 F. Supp. 2d at 913-15. The Court found that the taxpayers were not acting to capitalize on the distressed-sale price of the hospital equipment, but rather were acting to keep the equipment

in use. Id. Simply because a taxpayer's efforts result in a windfall does not mean he acted with the intent to benefit from that windfall. Id. at 916. In Consolidated Investors, the taxpayer donated real property in a bargain-sale transaction to the Ohio Turnpike Commission (OTC). To complete an interchange with another highway, the OTC needed to acquire a right-of-way and buy the taxpayer's property. The OTC offered $93,800, but the property had been rezoned, and the taxpayer's appraisal said it was worth $2.9 million. After several offers and counteroffers, the OTC eventually paid the taxpayer $950,000, and the taxpayer claimed a charitable-contribution deduction for the remaining fair market value. We determined that despite the OTC's failure to acknowledge the higher fair market value of the donated property, the taxpayer had made a valid donation of $641,000. As in Herman and Consolidated Investors, the taxpayers here obtained good appraisals, and we see no reason why we should not accept Cave Buttes' appraisal report in its entirety as the best reflection of fair market value and determine that it was entitled to the full amount of the deduction. See Consolidated Investors, T.C. Memo. 2009-290.[19]

---

[19] We listed as a third issue whether Cave Buttes owed an accuracy-related penalty for gross-valuation misstatement under section 6662(h). Because the value of Cave Buttes' property is actually higher than the amount that it claimed on the partnership return, there can be no penalty under section 6662(h).

To reflect the foregoing,

An appropriate order will be issued.